(49 Misc. Rep. 578.)

## PUTNAM v. LINCOLN SAFE-DEPOSIT CO. et al.

(Supreme Court, Special Term, Onondaga County.  February, 1906.)

1. TRUSTS—FAILURE TO INVEST TRUST FUND—LIABILITY OF BENEFICIARY.

Where, after the death of a testamentary trustee and his beneficiary, securities constituting part of the trust estate, some of them naming the beneficiary as the payee, and others being payable to the trustee or to bearer, were found in a safety-deposit box, which had been rented in the names of the trustee and beneficiary, the failure of the trustee to convert some of the securities which were not lawful investments for trust funds into lawful investments, while it might render the estate of the trustee liable, did not render the estate of the beneficiary liable, where she had never had possession or control of the securities, so that she could not be held as a trustee de son tort.

2. SAME—PROPERTY CONSTITUTING TRUST FUND—PRESUMPTION.

Where there were found in a safety-deposit box securities constituting part of a trust estate and other securities standing in the name of the beneficiary, which had been received on the surrender of a transfer of certain original certificates that had stood in the name of the beneficiary, which she had indorsed and surrendered after their receipt, the presumption is that the trustee continued in possession of the new securities, and that they constituted a part of the trust estate.

3. LIMITATION OF ACTIONS—COMPUTATION—EXISTENCE OF TRUST.

In an action by a remainderman against the personal representatives of a trustee and beneficiary for an accounting and to enforce a liability against the estate of the beneficiary as a trustee, where it appeared that certain securities had stood in the name of the beneficiary, and were indorsed and sold by her, checks to her order being given in payment, and it does not appear how she disposed of the money, she, not having been a party to the decree adjudicating a trust, is presumed to hold the fund as trustee; so that the statute of limitations did not commence to run in her favor until her death, when the remaindermen became entitled to the possession of the estate.

4. SAME.

Where a testator owned shares of stock in a corporation organized under the laws of a foreign state, the laws of which provided that corporate stock should be treated as real estate, or might be transferred as personalty, and required that a will conveying real estate should be attested by three witnesses, while the testator's will creating a trust in the shares of stock in question was attested by only two witnesses, and the stock was administered on and distributed to the heirs and next of kin of the testator, the beneficiary of the trust having received a part of the stock in hostility to the trust, the statute of limitations commenced to run immediately as against remaindermen.

5. TRUSTS—PROPERTY BELONGING TO TRUST FUND—PRESUMPTION.

Where there were found in a safety-deposit box which had been rented by a testamentary trustee and his beneficiary securities constituting a part of the trust estate, and certificates representing shares not received from the testator's estate standing in the name of the beneficiary, not shown to have been bought with trust funds, the certificates are not presumed to have been part of the trust estate, though purchased with checks on a joint bank account standing in the name of the trustee and beneficiary, in which were deposited the proceeds of sale of certain trust securities.

6. SAME—DECLARATION BY TRUSTEE.

Certificates of stock purchased with the personal funds of the trustee, and transferred to the beneficiary, and declared by the trustee in writing before his death to have been a part of the trust fund, will be deemed a part thereof and distributed accordingly.

**7. SAME—CONSTRUCTIVE TRUST.**

Where payments were made from a joint bank account of a trustee and beneficiary for the improvement of the real estate of the beneficiary, the beneficiary will not be chargeable as a trustee de son tort for the benefit of the remaindermen for the amount so expended.

**8. JUDGMENT—MERGER OF CAUSE OF ACTION—PROMISSORY NOTE.**

Where a beneficiary gave her note to the trustee for an amount less than that for which she was liable to the trustee, it is presumed that it was given as a settlement of a part of the liability, and a recovery on the note in addition to the liability found will not be authorized.

Action by Robert M. S. Putnam against the Lincoln Safe-Deposit Company and others. Judgment for plaintiff.

See 80 N. Y. Supp. 961.

Stickney, Maclay & McBurney (M. Edward Kelley, of counsel), for plaintiff.

Corliss Sheldon, for Israel Putnam, and in person as administrator of John R. Putnam, deceased.

Duer, Strong & Whitehead (Nash Rockwood and Edgar T. Brackett, of counsel), for defendant John Risley Putnam.

Harry P. Pendrick, in person as administrator with the will annexed of Mary S. Putnam, deceased.

Samuel Hoff, for Lincoln Safe-Deposit Company.

H. T. KELLOGG, J. By the will of Robert M. Shoemaker, of Cincinnati, Ohio, who died in the year 1885, there was bequeathed to John R. Putnam, as trustee, a substantial portion of his estate, to have and to hold the same to the use of Mary Steiner Putnam for life, and to pay over the same to her children upon her decease. Mary Steiner Putnam was the daughter of the testator and the wife of John R. Putnam, the trustee. In fulfillment of this bequest, securities of the par value of more than $175,000 were, in the years 1887 and 1888, delivered over to John R. Putnam by the Shoemaker executors. John R. Putnam died in the year 1899. In June of the following year one of the Putnam children brought this action to have all trust securities paid over to a substituted trustee, and for an accounting against the trustee's estate, and against Mary Steiner Putnam, the lifetaker, because of certain facts relating to the management and use of the trust property. Subsequently, on September 30, 1900, Mary Steiner Putnam died, leaving three children, Robert M. S. Putnam, this plaintiff, Israel Putnam, and John R. Putnam, and bequeathing by her last will to Israel Putnam all of her estate. By a supplemental summons, issued in 1900, this action was continued against her estate, and by the supplemental complaint then served it was demanded that the trust estate be divided among her three children equally, and that an accounting be had. An interlocutory judgment followed, decreeing that, by the terms of the Shoemaker will, John R. Putnam was constituted trustee of the property in question, to hold for Mary Steiner Putnam for life, and upon her death to pay over the same to her children, who, because of the death of the trustee and lifetaker, were then entitled to the same in equal shares, and ordering a reference to state the accounts of the parties. This judgment was affirmed. Subsequently, an accounting was had

before a referee, as provided in the interlocutory judgment. The referee's report was confirmed at Special Term, and final judgment entered, decreeing a division of the trust property on hand, declaring certain securities in the possession of the estate of Mary Steiner Putnam to be subject to the trust, and further adjudicating a liability on the part of the estate of both John R. Putnam and Mary Steiner Putnam to pay over moneys to the persons now entitled to the trust estate, because of dealings had with the trust funds by the said trustee and the said lifetaker. Upon appeal this judgment was reversed, on the ground of errors committed by the referee upon the accounting, in admitting certain evidence declared to be incompetent. This accounting was thereupon had at Special Term.

It was proven upon the trial that of the original securities (not including Augusta Factory, Sibley Manufacturing Company, and Langley Manufacturing Company stock, par value $17,500 to be considered hereafter), amounting to $176,490.75 par value, delivered over to John R. Putnam by the Shoemaker executors, there were in his possession at the time of his death original securities of the par value of $76,200 only. There were missing, therefore, old securities of the par value of $100,-290.75. No new securities taken out in the name of John R. Putnam as trustee have been discovered. For any deficit in the trust fund, the estate of John R. Putnam is of course responsible. It is not, however, the sole purpose of this litigation to charge the estate of John R. Putnam with such liability. The plaintiff seeks herein to trace the missing securities to Mary Steiner Putnam, the lifetaker, and to recover from her estate either certain specific property and securities, as the product of the missing securities, or otherwise to fasten upon her liability for the devastavit.

It can hardly be doubted that the original securities, amounting, as before stated, to $76,200 par value, in the possession of John R. Putnam, trustee, at the time of his death, belong to the trust fund, and should be divided among the children of Mary Steiner Putnam. In September, 1887, the executors of the will of Robert M. Shoemaker began to make division of the property left by him among the various legatees entitled thereto. During the fall of that year and during the year 1888, in conformity with their plan of division, they delivered over into the hands of John R. Putnam, trustee, securities of the Shoemaker estate, consisting of stocks, bonds, etc., of the par value, as above stated, of $176,490.75. These securities, with two exceptions, were receipted for by "John R. Putnam, Trustee." They were in fact all actually received by John R. Putnam, their proper custodian and the person entitled to the legal estate therein. Of this amount, securities of the par value of $104.600 named Mrs. Putnam as the payee or the person entitled thereto, upon the face thereof, when, for the purposes of division, the Shoemaker trustees had obtained new certificates, etc., in lieu of old stock script, or in the indorsements upon the back of such securities, when the identical securities were turned over. The other securities were made out to bearer or John R. Putnam, trustee. Upon the receipt of these securities by John R. Putnam, they were placed in a safety-deposit box, rented of the Lincoln Safe-Deposit Company in the name of Mary S. Putnam and John R. Putnam. It is in this box

alone that any of the old Shoemaker securities so paid over can be found; and of these, as above stated, securities only of the par value of $76,200. Of this total, securities to the par value of $33,300 only, belong to the class of original securities, reading in the name of John R. Putnam, trustee, or made out to bearer. These securities undoubtedly belong to the trust estate, for John R. Putnam, as trustee, always had the legal title thereto, and the possession thereof was at all times solely in him. Of the remaining securities $42,900, par value, all in the name of Mary S. Putnam, there are two classes: First, Stock certificates to the par value of $30,000 (Cincinnati Union Stock Yards, Merchants' National Bank of Middletown, First National Bank of Jacksonville, Commercial Bank of Cincinnati), which are the identical certificates belonging to the Shoemaker estate, originally delivered over to John R. Putnam. These certificates were never in the possession of Mary Steiner Putnam nor in her custody, nor at any time handled by her, nor did she at any time by any act whatever exercise dominion over them, or claim to be the owner thereof. Since they have always been in the possession of the trustee, and never have been delivered to Mrs. Putnam, they have at all times been subject to the terms of the trust created by the will of Shoemaker, their donor. The mere fact that, by accident, mistake, or otherwise, the name Mary Steiner Putnam appears therein as the person entitled thereto, since she never received them or claimed them, cannot alter the fact that they are trust property, and in equity belong to the children of Mary Steiner Putnam, upon whom the title to the trust securities has now been cast. In reference to these particular securities, Mary Steiner Putnam never at any time owed any active trust duty. As to them, since she never handled them or dealt with them in anywise whatever, she was not a trustee de son tort, responsible for neglect. The failure of John R. Putnam, trustee, therefore, to dispose of the stock of the First National Bank of Jacksonville and of the stock of the Commercial Bank of Cincinnati, an unlawful detention by him of investments in foreign corporations, by which $6,500 has been lost to the estate, in no wise created a liability upon the part of Mary Steiner Putnam, although for his own negligence in respect thereto his estate is plainly chargeable. Second. Belonging to the second class are securities made out in the name of Mary S. Putnam, amounting to $12,900, par value, which are not the identical securities originally paid over by the Shoemaker executors. They consist of stock certificates in various companies, exchanged for the original stock in the same companies; the exchanges being made for formal reasons of convenience, upon the surrender or transfer by Mary Steiner Putnam, of the original certificates. Upon the surrender and transfer of these certificates, since they read in her name, the same must have come, momentarily, at least, into the custody of Mary Steiner Putnam for indorsement, who thereby exercised dominion over them. Nevertheless, the new certificates, when received, were given oven to John R. Putnam, and were placed in the safety-deposit box. It might be said, perhaps, that this box, being in the name of both the Putnams, the contents thereof were possessed by both, and that, therefore, the return of these certificates to this box does not signify a return to the possession of the trustee. Nevertheless, when the securities,

of which these are the substitute, were originally delivered, they were delivered to the trustee and received by the trustee. By depositing them in a box, although rented in the name of another person with himself, he did not part with their possession, nor possess another person therewith. He still retained possession, and sole possession, as it was his duty to do. When the new certificates were taken out and again placed in the safety-deposit box, presumptively, they were placed there to be held as the originals were—in the sole possession of John R. Putnam, trustee. Therefore, it seems plain that the original securities found in the safety-deposit box at the death of John R. Putnam, amounting to $76,200, par value, belonged, all of them, to the trust fund under the Shoemaker will.

Of the securities made out in the name of Mary Steiner Putnam, individually, and delivered over to John R. Putnam by the Shoemaker executors, amounting in all to $104,600, par value, there have been found, therefore, in the safety-deposit box or elsewhere, securities of the par value of $42,900 only, leaving $61,700 of securities running to Mary Steiner Putnam, individually, as missing. As disclosed by the evidence, all these securities have been sold. With two exceptions they were sold in the years 1887, 1888, and 1889. The Adams Express Company stock and the Dayton & Union Railway bonds, both belonging to this class of securities, were sold; the former in February, 1892, for $8,400, and the latter in July, 1896, for $6,660. In some instances the evidence does not disclose the price at which these securities were sold, although in a majority of cases it does; but, taking the actual purchase price in those cases where it is given, and the market value or par value in those cases where the purchase price is not given, we find that the total of these sales realized $68,410. All of these securities were sold upon the personal indorsement of Mary Steiner Putnam. In many instances it was shown that the checks given in payment for these purchases were in fact payable to Mary Steiner Putnam. Since all these securities were in the name of Mary Steiner Putnam, and were transferred upon her indorsement, it is a fair presumption that all the checks so received were payable to her individually. With the receipt of these checks by Mary Steiner Putnam, the record in this case abruptly adandons further search, and we are left without further proof showing the disposition of this fund by Mary Steiner Putnam. It has not been shown that she collected upon these checks. Frequently she did. It has not been shown where, if anywhere, she deposited the money received upon these checks. It has not been shown what has been done with this money by her; whether she retained it and used it; whether she invested it; whether, if invested, she invested it for herself in her own name, or invested it for the estate, or whether she paid it over to the legal possessor thereof, and to the person entitled to the legal estate therein, to wit, the trustee, John R. Putnam. We know only the simple fact that Mary Steiner Putnam, received, as proceeds of sales of trust securities which were in her name, the sum of $68,410, that these moneys were paid to her individually; and upon these facts, and such presumptions and inferences as may arise therefrom, must our conclusions be based. The plaintiff is content with this record. Having

proven this fund into the hands of Mary Steiner Putnam, he asserts that the burden is upon her representatives to explain its disposition; otherwise, that her estate is liable for the return of these moneys.

With the exception of the Dayton and Union Railway bonds, sold in July, 1896, for $6,660, these moneys were received by Mary Steiner Putnam more than six years prior to the beginning of this action; and, with the further exception of the Adams Express stock, sold in February, 1892, for $8,400, these moneys were received by Mary Steiner Putnam more than ten years prior to the beginning of this action.

It is claimed by the representative of Mary Steiner Putnam, in case the receipt of this money establishes liability on the part of their decedent, that the claim is barred by the statute of limitations. The statute does not begin to run against a trustee of an actual, express, subsisting trust until open repudiation of the trust. Yet, in the case of a trustee ex maleficio, the statute runs from the time that the wrong was committed. Decouche v. Savetier, 3 Johns. Ch. 190; Kane v. Bloodgood, 7 Johns. Ch. 90; Lammer v. Stoddard, 103 N. Y. 672, 9 N. E. 328; Price v. Mulford, 107 N. Y. 303, 14 N. E. 298; Mills v. Mills, 115 N. Y. 80, 21 N. E. 714; Wood v. Young, 141 N. Y. 211, 36 N. E. 193; Ludington v. Thomson, 153 N. Y. 499, 47 N. E. 903; Wood v. Supervisors of Monroe County, 50 Hun, 1, 2 N. Y. Supp. 369; Brown v. Brown, 83 Hun, 160, 31 N. Y. Supp. 650; Perry, Trusts, § 865. Thus one who wrongfully borrows money upon forbidden and worthless securities is a trustee ex maleficio, protected by the statute in six years. Lammer v. Stoddard, supra. The purchase with trust moneys by a county treasurer of worthless securities from his own firm creates a constructive trust on the part of his partner, which may not be enforced after six years. Price v. Mulford, supra. Six years protects a grantee of land, the deed being really a mortgage, who upon a sale thereof collects a large surplus over his debt, which he fails to pay over. It runs from the time he collects, although no demand is made. Mills v. Mills, supra. An agent who collects life insurance for another is a trustee from the time of its receipt, and the statute runs in six years. Wood v. Young, supra. A county treasurer who diverts town funds in his hands for the benefit of a county is an express trustee, and the statute does not run. But against the county, which has received the money wrongfully, it runs in six years. Wood v. Supervisors of Monroe County, supra. Thus we have cases, not only where the money was rightfully received and wrongfully detained, but cases where the receipt of the money in itself was a wrong; and in each class of cases the trust implied by law was held not to suspend the operation of the statute. If, therefore, Mary Steiner Putnam had been a stranger to this title, if she had received the money in defiance of the trust, or had retained it adversely to the trust, she would plainly have been a trustee ex maleficio; and within the authority of these cases the statute would have run in her favor before the commencement of this action.

Nor is it any answer to say that the trustee might have been barred after six years, but that the cestui que trust, not then being entitled to possession, would not have been. In a suit to recover converted securities or moneys of the estate, the trustee would have represented

every legal and equitable interest.  Matter of Straut, 126 N. Y. 201, 27 N. E. 259.  Because of such conversion, only one cause of action would have arisen; not one in favor of the trustee while trustee, and another in favor of remaindermen when the trust expired, but one and one only, and that immediately upon the commission of the wrong, in the trustee's favor, representing all interests, legal or equitable, and never in favor of any other person apart from him.

There are no limitations, except as contained in the Code of Civil Procedure, and all such limitations are fixed and arbitrary.  When a cause of action arises, the statute begins to run, and, within the time fixed, action is barred.  Gilmore v. Ham, 142 N. Y. 1–6, 36 N. E. 826, 40 Am. St. Rep. 554.  A suit for conversion against Mrs. Putnam, as such stranger, would have been barred in six years; and the bar would have operated against remaindermen as represented by the trustee.  Bennett v. Garlock, 79 N. Y. 302, 35 Am. Rep. 517.

There is, however, a trust known to the law which is not strictly an express trust, nor yet merely a trust ex maleficio, which requires merely and only immediate restitution of trust property taken.  I speak of a trust whose incumbent is sometimes called a trustee de son tort.  In that such a trustee may at any time be dispossessed because of his wrong, and made to restore what he has received on proof of that wrong, he is akin to a trustee ex malificio, just spoken of.  But he is more.  Instead of repudiating him and his acts, charging him because of his original wrong, those beneficially interested elect to treat him as the actual, rightful trustee, and to hold him to the active duties and liabilities of a trustee of an express trust.  In order to create such a trust, assent on the part of the trustee, express or implied, and voluntary assumption of trust duties would seem to be necessary.  Perry, Trusts, §§ 245, 265.  Such a trustee might, perhaps, better be termed a trustee in fact; for his duties are not to repair a wrong, but to conduct a trust.

There are very few cases in this state where the doctrine of trustees de son tort has been discussed.  There is, however, a very interesting exposition of this subject, although apparently foreign to the matters in controversy, to be found in an opinion of Commissioner Dwight in Easterly v. Barber, 65 N. Y. 252.  The learned judge sums up the discussion with these words:

"A person having voluntarily assumed the character of trustee shall not be permitted to deny either as to his co-trustees or the cestui que trust that he held that character, or to disallow his acts done in that capacity."

A case is cited by him from the English reports (Rackham v. Siddall, 16 Simons, 297), where one acting as a trustee sold property, and paid over the proceeds to the life tenant.  It was held that she could not plead the statute of limitations, because her situation was, in effect, that of a trustee of an express trust.  "If she had by writing declared herself to be a trustee, the trust in her could not have been otherwise than express, and her conduct is equivalent to her written declaration."

That a trustee de son tort may not plead the statute finds some countenance in Mills v. Mills, supra.  There Judge Earl says:

"The novel claim is made on behalf of the plaintiff that the defendant may be held as executor de son tort of his brother's estate, and hence the statute of limitations must be applied as if he were rightfully and actually executor with his brother's estate in his hands."

Judge Earl answers the claim by pointing out, not that the rule of law is otherwise, but that in the particular case the defendant was not such executor.

The principle therefore is one of estoppel. Those beneficially interested may elect to treat a person receiving money belonging to a trust as a wrongdoer, or they may treat him as the actual trustee of an express trust, whose breach of duty is a failure to pay over when the trust is terminated, at which time the cause of action accrues. If Mrs. Putnam was such a trustee, the remaindermen had a cause of action arising at the end of her life, when her life use ceased. An executor, although trustee, may pay over to a lifetaker all trust securities, upon taking a bond for the protection of the remaindermen. Smith v. Van Ostrand, 64 N. Y. 278. If an insufficient or illegal bond be taken, the remaindermen may recover of the life tenant the property so made over, and the statute is no bar. Lee v. Horton, 104 N. Y. 538, 11 N. E. 51. In the case cited, the court said:

"Neither could Horton [the lifetaker] acquire any title to such moneys by by agreement with the plaintiffs. All of the parties dealt with the fund knowing it to be the subject of a trust, and incapable of alienation, and that its trust character followed it into the hands of any person receiving it with knowledge of the facts."

In that case the trust was recognized by the giving of a bond, though it was insufficient and illegal.

In Gilbert v. Taylor, 148 N. Y. 298, 42 N. E. 713, a fund of $10,000 was given to executors for D. for life, and after her death to testator's sister, the plaintiff. The executors paid the whole amount to residuary legatees. These legatees paid the lifetaker her annual use. It was held that the statute did not apply to bar remaindermen. "When the legacy became payable by the terms of the will, the plaintiff's cause of action arose." In that case, the trust was recognized by the payments to the life tenant of the annual profits of the fund.

These cases do not define the grounds of decision. The broad but unexplained assertion is made that the causes of action did not accrue until the remaindermen were entitled to possession. This is susceptible of a double meaning. First. It may mean that the intermediate disability to sue on the part of remaindermen postpones the right of action until the right to possession accrues. But, under other authorities, this cannot be true; because, as pointed out, a wrong done to the fund is immediately actionable at the suit of the trustee, and, if he is barred by lapse of time, so are the remaindermen. Second. It may mean that the fund taker's possession in such cases is of such a character that he is, in effect, a trustee of an express trust, whose fiduciary character when asserted may not be denied. As such his duty it to pay over at the end of his term, not before; a time simultaneous with the termination of the particular estate and the beginning of the term in remainder. Hence, there is no breach of duty until then, and therefore, as asserted, no cause of action until the remaindermen are entitled to possession. This must

be the true meaning of these decisions. Otherwise, they are out of tune with other holdings. In the cases cited there was an express recognition of the trust by those taking. Where the taker is a stranger to the title, without such proof his taking is evidently hostile, and he cannot be a trustee with the attributes of an express trustee. But, where a life tenant is the person taking, he is one who has an equitable title in the fund. There being no proof to the contrary, it is fair to presume that his taking, which is only technically wrong, is for the enjoyment of his limited title. Presumably, a life tenant takes as life tenant, which is equivalent to saying that he does not thereby intend to appropriate the equitable fee, but holds the fund, in accordance with the title conferred, for himself for life, and for those in remainder after him. Without proof, therefore, of a contrary purpose in taking, a life tenant who possesses himself with the principal fund does so in recognition of the title conveyed, and is himself a trustee, having the character of a trustee of an express trust, in whose favor the statute of limitations does not run. This I take to be a correct proposition under the authorities.

Mary Steiner Putnam knew that her father's will created a trust. She was a party to a decree of the Ohio courts, rendered in the year 1887, which so adjudicated. She was the lifetaker, wife of the trustee, and those taking in remainder were her children. We know that she received a trust fund amounting to $61,700. It has not been shown that she has dispossessed herself of this fund. It must be presumed that she retained it, and that it is on hand. Under the authorities cited, the facts must be implied that she retained it for the purposes of the trust, to do with it what was right, to carry out the provisions of a will under which she herself had a life use, to enjoy that use, and to pay over the principal to her children at her death. She was, in effect, the trustee of an actual subsisting trust, and her representatives may not set up the statute of limitations. Her estate is liable for the return of this fund.

In speaking of the securities turned over by the executors of Robert Shoemaker to John R. Putnam, of securities found in the safety-deposit box at the time of the death of John R. Putnam, and of securities taken out in the name of Mrs. Putnam and sold by her, mention has not been made in the above discussion of three classes of securities, namely: 40 shares in the Augusta Factory, of the par value of $4,000; 115 shares in the Sibley Manufacturing Company, of the par value of $11,500; 20 shares in the Langley Manufacturing Company, of the par value of $2,000. All these securities belonged to Robert M. Shoemaker at the time of his death.

The Augusta Factory and the Sibley Manufacturing Company were corporations organized under the laws of the state of Georgia; their places of business and principal offices being in that state. By the laws of that state, stocks representing shares in mining and manufacturing companies, whose principal investments are in realty and machinery attached thereto, are deemed to be real estate. Rev. Code, § 2237. This section, as amended in 1883 (Laws 1882–83, p. 56), further provided that stock, representing shares in manufacturing companies, may be transferred from one person to another, for any purpose whatsoever, by

the same means as are or may be allowed by law for the transfer of personal property. The law of Georgia requires three witnesses to a will. There were but two to the Shoemaker will. As an original proposition, it might be (since such property, although real estate, could be transferred in the same manner as personal property) that under these provisions the will of Robert Shoemaker, although having only two witnesses, was sufficient to devolve title to such stock upon his legatees. It does not seem to me, however, that this is now an open question. On the 1st day of April, 1887, Michael M. Shoemaker and Robert H. Shoemaker, who were executors of the will of Robert M. Shoemaker, petitioned the court of ordinary of Richmond county, Ga., for letters of administration upon the estate of Robert M. Shoemaker, setting forth in their petition that at the time of his death he was the owner of the above-mentioned stock, and that, the same being real estate, his will did not operate to pass title thereto. On May 6, 1887, letters of administration were accordingly issued to the said persons out of the said court. On the 9th day of November, 1887, the said persons as administrators again petitioned the said court, setting forth the ownership by their decedent of the said stock, that the same was real estate, that the will of their decedent, being executed by two witnesses only, was not sufficient to pass title thereto, and praying that commissioners be appointed to distribute and divide the same among the next of kin and heirs of Robert M. Shoemaker. John R. Putnam, as trustee under the will of Robert M. Shoemaker, acknowledged in writing due and legal service of such application, and waived all further notice. Commissioners were accordingly appointed, who thereupon made division of said stock, awarding to Mary Steiner Putnam 20 shares of the Augusta Factory stock and 100 shares of the Sibley Manufacturing Company stock. It was thereupon ordered that the administrators distribute the stock in accordance with this division. On March 5, 1888, Mary Steiner Putnam individually receipted to the administrators of Robert M. Shoemaker for the amount of stock so divided. John R. Putnam as trustee, in a receipt addressed "Estate of R. M. Shoemaker to Mary S. Putnam, Dr.," had previously, on February 27, 1888, receipted for the same, and also for 20 additional shares of the Augusta Manufacturing Company stock. These additional shares must have been the allotment made to another Shoemaker heir, which were given up by him upon the division. Upon these proceedings, John R. Putnam, as trustee, represented the whole title, including the interest of all the cestuis que trustent. Between the administrators, on the one hand, claiming through intestacy, and John R. Putnam, as trustee, representing those claiming under the will a one-fifth interest in the Shoemaker estate, on the other hand, it was then adjudicated that this stock passed by intestacy to the Shoemaker next of kin. This decision was binding upon all the cestuis que trustent of John R. Putnam, trustee. Matter of Estate of Straut, 126 N. Y. 201, 27 N. E. 259. "Executors, administrators, assignees, and receivers all act representatively as trustees of other persons, and yet in actions brought by them to recover trust property, or to reduce trust property to possession, the beneficiaries and parties ultimately entitled to the benefit of the property are not necessary parties. * * *

In such an action they represent the whole title and interest, and their action, in the absence of fraud or collusion, is binding upon the beneficiaries. * * * Wherever a trustee may sue in his own name without joining the beneficiaries of the trust, in the absence of fraud or collusion, the beneficiaries are bound by the results of the action." Matter of Estate of Straut, supra. In the case cited it was held that trustees in an action relating to their trust estate represented, not only the life-takers, but also those entitled to share in the remainder. As to the stock in the Langley Manufacturing Company, the evidence is clear that, under the laws of South Carolina, it was real estate, and the will of Robert Shoemaker was not effective to devolve title thereto. All of these stocks, except 20 shares of the Augusta Factory stock, were sold by Mrs. Putnam in the year 1888. All of these stocks had been taken out in her name. It had been adjudicated that she was the owner thereof. There is no room for the claim that she received these stocks, sold them, or received the proceeds thereof, in recognition of any trust duty; nor can she be held, as to such stocks and their proceeds, to have been an actual trustee or a trustee de son tort. Their receipt and their sale was more than six and more than ten years prior to the beginning of this action. As she received them and sold them in hostility to the trust, it is immaterial whether or not the adjudication mentioned was binding, for the statute of limitations has long ago outlawed any claim against her therefor.

New securities were found in the safety-deposit box. Among others, they consisted of 290 shares of stock in the Delaware & Hudson Company and 78 shares of stock in the Central Railroad of New Jersey. These securities did not belong to, and were not received from, the estate of Robert M. Shoemaker. The stock certificates read in the name of Mary Steiner Putnam, individually.

As to the Delaware & Hudson Company shares, it specifically appears by the evidence that this stock was bought with moneys belonging to Mary Steiner Putnam, being the proceeds of an insurance loss on property belonging to her. As to the shares in the Central Railroad of New Jersey, mentioned, there is no evidence to show that they were purchased with trust funds. Soon after the death of Robert M. Shoemaker, John R. Putnam began an account with the First National Bank of Saratoga in the name of John R. Putnam and Mary S. Putnam. In this account deposits of the proceeds of sales of certain trust securities were made. These were securities which originally read to John R. Putnam, trustee, or to bearer. No deposits of proceeds of securities sold which were in the name of Mary S. Putnam have been shown. Deposits of income received from trust securities were also made in this account. So far as this evidence discloses, the deposits were made by John R. Putnam, and no deposits appear to have been made by Mary Steiner Putnam. Checks were frequently drawn by John R. Putnam upon this account for various purposes. No checks drawn by Mary Steiner Putnam have been shown in evidence. A witness testified upon the trial that he "thought" that Mary Steiner Putnam checked upon this account; but on cross-examination he swears that he recollects no checks drawn by Mary Steiner Putnam upon this account before the death of John R. Putnam. Since Mary Steiner

Putnam never deposited in this account or checked upon it, she cannot be presumed to have had knowledge of the nature of the deposits therein made. So far as any act of hers shown in evidence is concerned, she was a total stranger to this account. Therefore, it cannot be correctly said that, because private moneys and trust moneys were mixed in this account, and so intermingled that the nature of the funds withdrawn is undiscoverable, the burden is upon Mary Steiner Putnam to disprove that securities in her name, bought with checks upon the joint account, did not withdraw trust moneys. As she was a stranger to the account, the presumption that all such securities were bought with other than trust moneys must prevail.

The fact that these securities were found in the safety-deposit box is no proof that they belonged to the trust fund. Putnam v. Lincoln Safe-Deposit Co., 87 App. Div. 17, 83 N. Y. Supp. 1091. Consequently, there is no proof in the case showing that the stocks now under consideration ever belonged, in law or in equity, to the trust estate.

The remaining "new securities" found in the safety-deposit box, consisting of 170 shares in the Western Union Telegraph Company and 15 shares in the First National Bank of Saratoga, stand upon a very different footing. These stocks were purchased with the personal funds of John R. Putnam. These stocks named him upon the face thereof as the person entitled thereto. They are indorsed by him with words of sale and transfer for value to Mary Steiner Putnam. To pass title to her, there must have been either, first, an actual sale for value, or, second, delivery of the certificates. Now it is true that a specific chattel may be sold for value, and the title thereto be transferred without delivery of the thing or of any paper selling it. It is likewise true that a stock certificate is a chose in action, and that choses in action may be transferred orally, without delivery of any writing evidencing the debt. But in such cases there must be an actual bargain between the parties. Each must engage therein, and the present passing of the title from the one to the other must be stipulated for. By the transfer in question, John R. Putnam asserts that he thereby sells for value. This is not an admission of a previous sale or bargain therefor. The act of sale is the instrument itself. A previous bargain with the transferee is not necessarily implied thereby, nor is the inference deducible that the transferror has communicated his design to the proposed purchaser, who has herself stipulated for the act thereby performed. So far as the proof goes, the act of transfer was one-sided, and there was no bargain between the parties. It was therefore not binding without delivery. Was there delivery? The certificates were in the box rented by both the Putnams, and containing the possessions of both. Since both had access to the box, I think it cannot be inferred that such deposit was made by Mrs. Putnam, thus involving a precedent act of delivery. It must be inferred, then, that the securities were placed in the box by John R. Putnam. The requirement of delivery is insisted upon in order that there may be an unequivocal and final act, which makes an act of transfer irrevocable. The change of possession must be complete. There must be no retention of dominion over the thing transferred. The deposit in this case was a

most equivocal act, evidencing nothing with even reasonable certainty. Since the box of deposit was one containing property of the depositor, the deposit may have been intended as a deposit for himself. Dominion was retained. The depositor had access to the box, and, because it was in part his own box, he could remove the thing deposited, asserting that it was his own, which assertion no one could gainsay. There was no actual change of possession. It is entirely possible that John R. Putnam, at the time of the transfer, took the certificates from this very deposit box, indorsed them, and put them back again. That certainly was not tantamount to a delivery, nor did possession change. For all these reasons, it is clear that the certificates in question were not effectively transferred to Mary S. Putnam. They remained the property of John R. Putnam. These securities were expressly declared by John R. Putnam, in a writing made shortly before his death, to belong to his trust under the Shoemaker will. This declaration of trust was effective against the declarant's property. Consequently, these securities are a part of the trust fund to be distributed.

An effort is made by the plaintiff to establish liability against Mary S. Putnam for $22,755, an amount alleged to have been expended out of trust funds by John R. Putnam in making improvements upon "Putnam Place"—Mrs. Putnam's property. On October 4, 1892, there was deposited in the Putnam joint account $18,318.75, being the proceeds of trust securities sold by Judge Putnam, and, on November 16, 1892, there was deposited $7,436.25, being likewise proceeds of trust securities. The account was balanced on October 13th, on which day the balance was $6,511.37. It was after this date that the checks to pay for improvements upon "Putnam Place" began to be drawn. At the very utmost, therefore, not more than $13,947.62 of these moneys could have been so expended. In the year 1892 the amount of money withdrawn from the account for the purposes mentioned was $8,958. In addition to trust moneys, which were in this account during the period of time when checks were being drawn, there were also other moneys to the amount of $1,867. Presumptively, these moneys, not being trust moneys, were first drawn out. There was expended, therefore, of trust moneys in the year 1892 for such improvements $7,091. At all subsequent dates, when checks were drawn for such purposes, there were more moneys in the account not shown to be trust moneys than there were checks drawn for the purposes mentioned. Doubtless the fund was further exhausted by checks for other purposes, but the dates when these checks were made are not given. Even if other withdrawals had been definitely proven, they would, perhaps, have gone only to show that the trust moneys took a different course than the "Putnam Place" improvements. It can be said, therefore, definitely and positively, that $7,091, not more, of these trust moneys went into the "Putnam Place" improvements or to pay bills therefor.

No effort is made here to establish a lien or impress a trust upon "Putnam Place" for the amount so expended thereon. The state of the pleadings and the parties to the action are not such that a claim to this real estate can herein be established. Regarded as payments made to creditors of Mrs. Putnam, then, they, not Mrs. Putnam, have

received the trust moneys. Regarded as direct advances to Mrs. Mary S. Putnam, as to them she cannot be regarded as a trustee de son tort or an actual trustee. They were not received, retained, nor used for the purposes of a trust, but for her own personal benefit from the beginning. She was liable, if at all, in conversion, or upon an implied contract for moneys had and received to her own use. Against such liability the statute ran in six years, or before the beginning of this action. No recovery therefor may be now had. On July 1, 1899, Mrs. Putnam gave her note to John R. Putnam, trustee, for $36,987. Value is expressed in the note as having been received. There was no present consideration for the note. The only consideration to support it was a previous indebtedness. We have shown that her indebtedness to the payee therein was far in excess of the amount named to be paid. To make her liable upon the original indebtedness and upon the note likewise would be a duplication of the same liability, which cannot be permitted.

The original securities delivered by the Shoemaker executors to the trustee, John R. Putnam, belonged to the trust, and must be divided. The estate of Mrs. Putnam is liable for the securities sold by her in the amount received. For the deficit remaining, after deducting the value of the "new securities" (Western Union Telegraph Company and Saratoga Bank stock) devoted to the trust, and for losses through failure to realize upon foreign securities, the estate of John R. Putnam is responsible.

Let findings be prepared accordingly.