SARANAC LAND AND TIMBER COMPANY, Respondent, *v.* JAMES A. ROBERTS, as Comptroller of the State of New York, Appellant.

SAME, Respondent, *v.* SAME, Appellant.

Tax — sale of non-resident forest lands for unpaid taxes — action of ejectment against state, claiming title under tax sales — when alleged errors in assessment of school taxes and sale of lands therefor do not affect title of state thereto.

1. The record of school district boundaries made by a town clerk imports verity perforce of his official duty to make it. If made without authority of law or by a person having no duty to perform it is mere hearsay. Where, however, the document is not a record made in the book in regular order, does not purport to have been the record of a description delivered to the town clerk by the school commissioner, but contains internal evidence showing that it was not the record or copy of some other document, was not made by the official whose duty it was to make it, but was made, and purports to have been made, by an official having no duty to perform in the premises, the presumption arising from the fact of its entry in the proper record book is conclusively rebutted by facts appearing upon the face of the document itself.

2. The neglect of a justice of the peace to affix his signature to a jurat is at most an irregularity and insufficient to vitiate subsequent proceedings based on the return of taxes by a collector, where the affidavit was signed by him.

3. The fact that the oath to an assessment roll was sworn to before the third Tuesday in August does not vitiate the subsequent proceedings and was cured by chapter 448 of the Laws of 1885. (*People* v. *Turner*, 145 N. Y. 451, followed.)

4. A tax sale must be so conducted that separate and distinct parcels may be redeemed by the payment of the taxes properly chargeable to each, but on examination of the facts, *held*, that the owner was not aggrieved by the manner of sale in this case, since it was not necessary to pay the taxes of some other person in order to redeem, hence the sale is not void upon that ground.

5. A description as to quantity is one of the least important matters even in a grant. Assessors cannot be expected to describe the land assessed by metes and bounds, courses and distances. If a mis-

take is made in the quantity of land assessed the remedy of the owner is before the assessors or the board of supervisors. In this case the description was sufficiently definite.

6. The contention that resident land was improperly assessed as non-resident, and was included in the land conveyed to the state by the tax deed, but no notice to redeem was served on the occupant, is not sustained by the evidence.

7. Subdivision 3 of section 13 of title 2 of chapter 13 of part 1 of the Revised Statutes providing that, " if the quantity to be assessed be the whole tract, such a description by its name or boundaries will be sufficient; but if a part only is liable to taxation, that part or the part not liable, must be particularly described," was substantially complied with and failure of the assessors to certify that the tract was not subdivided or that the assessors could not obtain correct information of the subdivisions is immaterial.

8. The objection that the return of unpaid taxes by the county treasurer to the comptroller for the years 1866 and 1869 did not specify or identify the taxes returned with those imposed for each of those years is untenable, as the dates of the certificates of the county treasurer plainly show the year for which the return is intended.

9. Upon examination of the facts in two actions of ejectment involving the title of the state, derived from a tax sale, to the north-west quarter of township 24, Harrietstown, Franklin county, and to the west half of the northeast quarter of said township, *held*, that, save for a single objection, which a change in the record has now removed from the case, none of the alleged defects or irregularities complained of could have prejudiced the rights of the owner in the slightest degree, and none of them are sufficient to vitiate the state's title even without the aid of a curative statute.

*Saranac Land & Timber Co.* v. *Roberts*, 152 App. Div. 918, reversed.

(Argued February 11, 1913;  decided April 29, 1913.)

APPEAL, in each of the above-entitled actions, from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered October 7, 1912, affirming a judgment in favor of plaintiff entered upon the report of a referee.

The nature of the actions and the facts, so far as material, are stated in the opinion.

19

*Thomas Carmody, Attorney-General (Edward R. O'Malley* of counsel) for appellant. The title of the state to these premises is not invalid because of the exception of 1,000 acres in the northwest corner in the assessment of the taxes. (*Marsh* v. *Ne-ha-sa-ne Park Assn.*, 25 App. Div. 34; *Walsh* v. *Ringer,* 2 Ham [Ohio], 435; *Coleman* v. *Shattuck,* 62 N. Y. 348; *Tallman* v. *White,* 2 N. Y. 71; *Woodside* v. *Wilson,* 32 Penn. St. 52; *Bosworth* v. *Danzien,* 25 Cal. 296; *Van Voorhis* v. *Budd,* 39 Barb. 479; *Mason* v. *White,* 11 Barb. 175; Blackw. on Tax Titles [4th ed.], 424.) The defendant's title is not void because of the exception of 1,215 acres of water in the assessment of taxes. (*Mason* v. *White,* 11 Barb. 173.) The state's title is not void because separate tracts of land were sold together, or because the whole tract was sold for the aggregate unpaid taxes of several years during some of which a part was not assessed. (*Ensign* v. *Barse,* 107 N. Y. 329.) The decision of the United States Supreme Court upon these claimed defects is conclusive in favor of the defendant. (Cooley on Taxn. 407; *Keely* v. *Sanders,* 99 U. S. 443; *Jackson ex dem. Kellogg* v. *Vickory,* 1 Wend. 407; 19 Am. Dec. 522; *Bowers* v. *Chambers,* 53 Misc. Rep. 259; *Doe ex dem. Hooper* v. *Clayton,* 81 Ala. 391.) The title of the defendant is not invalid because of its school taxes for the years 1869 and 1870. (Cooley on Taxation [3d ed.], 922; Blackw. on Tax Titles, § 1116; *Mo., K. & T. R. R. Co.* v. *Shannon,* 10 L. R. A. 681; *Jones* v. *Chamberlain,* 21 Wkly. Dig. 537; *Lessee of Ward* v. *Barrows,* 2 Ohio St. 241; *Lessee of Winder* v. *Startling,* 7 Ohio Rep. Cond. 499; *Hartwell* v. *Roots,* 19 Johns. 344; *Bank of U. S.* v. *Danbridge,* 12 Wheat. 70; *Pejapscut* v. *Rossan,* 14 Mass. 145; *School Dist. No. 1 of Pine River* v. *School Dist. No. 1 of Bethany,* 81 Mich. 339.) The taxes for the year 1867 are not shown to have been invalid by the verification of the assessment roll before the third Tuesday in

August. (*Bradley* v. *Ward*, 58 N. Y. 401; *Ostrander* v. *Darling*, 127 N. Y. 70; *Boyd* v. *Gray*, 34 How. Pr. 323; *Jackson* v. *Rowe*, 106 App. Div. 65, 69; *Wood* v. *Knapp*, 100 N. Y. 109; *People* v. *Chapin*, 38 Hun, 272; *Van Rensselaer* v. *Witbeck*, 7 Barb. 138; *Coleman* v. *Shattuck*, 2 Hun, 947; 62 N. Y. 348; *People* v. *Turner*, 145 N. Y. 451.) The state's title is not invalid for the reason that the resident lands contained in the assessment rolls for the year's tax entering into such sales were imperfectly and indefinitely described. (Black on Tax Titles [2d ed.], § 113; Cooley on Taxation [3d ed.], 737, 740, 747; *Van Deventer* v. *Long Island City*, 139 N. Y. 133; *Marsh* v. *N. P. Assn.*, 25 App. Div. 34; *Cromwell* v. *MacLean*, 123 N. Y. 474; *Joslyn* v. *Rockwell*, 128 N. Y. 334.) The title of the state is not invalid, because the comptroller sold 7,100 acres for the unpaid taxes for the years 1866 to 1869 with 6,700 acres for the unpaid taxes of the year 1870. (*Marsh* v. *Ne-ha-sa-ne Park Assn.*, 25 App. Div. 36; *Saranac Land & Timber Co.* v. *Roberts*, 178 U. S. 318.) The comptroller by his conveyance pursuant to the 1877 tax sale did not include any portion of the Ring lot, so called. (*People* v. *Hall*, 43 Misc. Rep. 117; 105 App. Div. 636; *Wells* v. *Johnston*, 171 N. Y. 324; *Jones* v. *Pashby*, 48 Miss. 637; *Schmitz* v. *Schmitz*, 19 Wis. 210; *Jenkins* v. *Sharpf*, 27 Wis. 472; 3 Washb. on Real Prop. [5th ed.] 429; *Wilson* v. *Randall*, 67 N. Y. 338; *Knapp* v. *Warner*, 57 N. Y. 668; *Maxon* v. *Maxon*, 16 N. Y. S. R. 74; *N. Y. Steamboat Co.* v. *Stern*, 46 Hun, 206; *Jackson* v. *Moore*, 6 Cow. 705; *Thayer* v. *Finton*, 108 N. Y. 394.) Chapter 448 of the Laws of 1885 is valid and operative as a curative act. (Cooley on Const. Lim. [7th ed.] 531; Blackw. on Tax Titles, § 452; Judson on Taxation, § 338; *Williams* v. *Board of Supervisors of Albany Co.*, 122 U. S. 154; *Costillo* v. *McConnico*, 168 U. S. 674; *Mattingly* v. *District of Columbia*, 77 U. S. 687; *Ensign* v. *Barse*, 107 N. Y. 329; *Terrel* v. *Wheeler*, 123 N. Y. 76; *Ostrander*

*v. Darling,* 127 N. Y. 79; *Gilmore* v. *City of Utica,* 131 N. Y. 26, 33; *Van Deventer* v. *Long Island City,* 139 N. Y. 133; *People* v. *Turner,* 145 N. Y. 457; *Smith* v. *City of Buffalo,* 159 N. Y. 427; *Conde* v. *City of Schenectady,* 164 N. Y. 258.) The omission of the signature of the justice of the peace from the return of the school collector for the year of 1870 does not invalidate the state's title obtained through the tax sale of 1877. (*Thompson* v. *Burhans,* 61 N. Y. 52; *Johnson* v. *Elwood,* 53 N. Y. 431; *Ladow* v. *Groom,* 1 Den. 429; *Cook* v. *Jenkins,* 30 Iowa, 452; *English* v. *Wall,* 12 Rob. [La.] 132; *Maples* v. *Hicks,* Brightly [Pa.], 56; *Farmers' Bank* v. *Gittinger,* 4 W. Va. 305; *Kruse* v. *Wilson,* 79 Ill. 233; *Capner* v. *F. M. Co.,* 3 N. J. Eq. 467.)

*Frank E. Smith* and *Thomas F. Conway* for respondent. The sale of the whole quarter for the taxes of 1868, 1869 and 1870, which were assessed against a part only, was illegal and void. (Black on Tax Titles [2d ed.], §§ 228, 258; *People* v. *Hagadorn,* 104 N. Y. 516; *Marsh* v. *Ne-ha-sa-ne Park Assn.,* 18 Misc. Rep. 314; 25 App. Div. 34.) The assessments of 1868, 1869 and 1870 were each illegal and void, for the reason that the statute governing the form and manner of making up the roll was not obeyed. (1 R. S. 391, § 13; 2 R. S. [8th ed.] 1097; Black on Tax Titles [2d ed.], §§ 90, 101; *Thompson* v. *Burhans,* 61 N. Y. 52; *Cromwell* v. *MacLean,* 123 N. Y. 474; *May* v. *Traphagen,* 139 N. Y. 478; *Sanders* v. *Downs,* 141 N. Y. 422; *Marx* v. *Hanthorn,* 148 U. S. 172; *Hubbell* v. *Weldon,* Hill & Den. Supp. 139; *Brevoort* v. *City of Brooklyn,* 89 N. Y. 128; *Stebbins* v. *Kay,* 123 N. Y. 31; *Lockwood* v. *Gehlert,* 127 N. Y. 241; *O'Donnel* v. *McIntyre,* 37 Hun, 615.) The facts found sustain the judgment declaring void the tax title claimed by the state. (*People* v. *Inman,* 197 N. Y. 200; *Clason* v. *Baldwin,* 152 N. Y. 204; *Sanders* v. *Downs,* 141 N. Y. 422; *Lockwood* v. *Gehlert,* 127 N. Y.

241; *King* v. *Townsend,* 141 N. Y. 358; *Cromwell* v. *MacLean,* 123 N. Y. 474; *People* v. *Ladew,* 189 N. Y. 355; *Ne-ha-sa-ne Park Assn.,* v. *Lloyd,* 167 N. Y. 431; *Saranac Land & T. Co.* v. *Roberts,* 195 N. Y. 303.) The school district collector did not verify his return of the unpaid taxes by affidavit. Failure of a collector to verify his return of unpaid taxes as required by statute is fatal to the validity of a sale based in whole or in part upon such tax. (*Thompson* v. *Burhans,* 61 N. Y. 52; *Striker* v. *Kelly,* 2 Den. 323; *Johnson* v. *Elwood,* 53 N. Y. 431.) The assessment roll of 1867 was sworn to before the third Tuesday of August, and was, therefore, void. (*Westfall* v. *Preston,* 49 N. Y. 349; *Brevoort* v. *City of Brooklyn,* 89 N. Y. 128; *Smith* v. *Mosher,* 31 N. Y. S. R. 235.) The land was sold at the 1877 sale as one parcel for the aggregate taxes of the years 1866 to 1870, inclusive, but the parcel assessed was not the same in each of these years. The general rule in regard to the sale of lands for unpaid taxes is that such sale must be made as the land has been assessed and taxed, and the practice of bunching into one parcel two or more lots which have been separately assessed, and selling them as one for the aggregate tax, has been uniformly condemned. (Blackw. on Tax Titles [5th ed.], § 526; Cooley on Taxation [2d ed.], 493; *National Fire Ins. Co.* v. *McKay,* 5 Abb. Pr. [N. S.] 445; *Thompson* v. *Burhans,* 61 N. Y. 52; *Turner* v. *Boyce,* 11 Misc. Rep. 502; *Marsh* v. *Ne-ha-sa-ne Park Assn.,* 18 Misc. Rep. 314; 25 App. Div. 34.) A portion of the land assessed as non-resident was resident. The assessment was, therefore, void. The west half of the quarter, as conveyed to the state by the comptroller's deed, included thirty-six acres of the Ring lot, which was resident land. A tax deed is not valid which purports to convey more land than was taxed or advertised for sale. (Black on Tax Titles, §§ 116, 401; Cooley on Taxation [3d ed.], 723–726; *Stewart* v. *Chrysler,* 100 N. Y. 378; *Joslyn* v. *Rockwell,* 128 N. Y. 334; *Hagner* v. *Hall,* 10 App. Div.

581; 159 N. Y. 52; *City of New York* v. *McLean,* 170 N. Y. 384.) A portion of the land conveyed by the comptroller's deed was actually occupied when the time to redeem from the sale expired, but notice to redeem was not served on the occupant. The deed, therefore, never took effect. (*Jackson* v. *Esty,* 7 Wend. 148; *Comstock* v. *Beardsley,* 15 Wend. 348; *Bush* v. *Davison,* 16 Wend. 550, 554; *Lucas* v. *McEnerna,* 19 Hun, 14; *Hand* v. *Ballou,* 12 N. Y. 541; *Lockwood* v. *Gehlert,* 127 N. Y. 241; *Harison* v. *Caswell,* 17 App. Div. 252; *People* v. *Ladew,* 189 N. Y. 355; 190 N. Y. 543; *Stewart* v. *Chrysler,* 21 Hun, 285.) The description of the deed assessed was not sufficient to identify the land with reasonable certainty. (*People ex rel. Park Bank* v. *Metz,* 141 App. Div. 600.) The account of unpaid taxes returned by the county treasurer to the comptroller for the years 1866 and 1869 did not identify the taxes returned with them or any assessment roll. The account of unpaid taxes verified by the collector and identified by the county treasurer is of vital importance in the proceedings leading up to the tax sale. It is in the nature of process and is the warrant without which the comptroller has no jurisdiction to proceed. All the requirements of the statute in relation to this warrant are mandatory and must be substantially obeyed. (Blackw. on Tax Titles [5th ed.], § 346; Black on Tax Titles [2d ed.], §§ 198, 199; Cooley on Taxation [2d ed.] 470–481; *Thompson* v. *Burhans,* 61 N. Y. 52; *Curtiss* v. *Follett,* 15 Barb. 337; *Ames* v. *Sankey,* 128 Ill. 523; *Shattuck* v. *Bascom,* 105 N. Y. 39; *Van Rensselaer* v. *Witbeck,* 7 N. Y. 517.) The present action is not barred by the limitation contained in chapter 448 of the Laws of 1885. (*Hamilton Park Case,* 139 N. Y. 240; *Witte Case,* 144 N. Y. 234.) The defects in the tax proceedings which led up to the sale of 1877 were not overcome and cured by force of chapter 448 of the Laws of 1885, considered as a curative law. (*People* v. *Inman,* 197 N. Y. 200.)

MILLER, J.  These are two actions in ejectment, designated as Nos. 1 and 2, begun in 1895, involving the title respectively to the northwest quarter of township 24, Harrietstown, Franklin county, and to the west half of the northeast quarter of said township.  A similar action, involving the title to the northwest quarter, was brought by the plaintiff in the United States Circuit Court for the Northern District of New York in 1895.  That action was tried, a judgment was rendered for the defendant and was affirmed by the United States Supreme Court. (*Saranac Land & Timber Company* v. *Roberts,* 177 U. S. 318.)  The plaintiff thereupon paid up the costs and took an order setting aside the judgment and granting a new trial.  Thereafter action No. 2 in the state court was brought on for trial, and a judgment was rendered in favor of the plaintiff, which was affirmed by the Appellate Division and by this court.  (125 App. Div. 335; 195 N. Y. 303.)  The state thereupon paid up the costs and took a new trial pursuant to the statute then in force. Both actions, Nos. 1 and 2, were then tried together before a referee, and the judgments in favor of the plaintiff entered upon his decision have been unanimously affirmed by the Appellate Division.

The defendant now attacks the plaintiff's title, but we shall assume that, but for the tax title of the state under the sale of 1877 for the aggregate highway, town, county and state taxes for the years 1866 to 1870 inclusive and the school taxes of 1869 and 1870, the plaintiff would have good title to the lands in controversy and shall confine our discussion to the objections raised to the state's title.  Those objections, with slight differences to be noticed later, are the same in both actions and depend for their validity upon substantially the same fundamental principles of law.  To save repetition, I shall consider the two together.

The effect of our decision on the former appeal is first to be considered, because, while the judgment then ren-

dered is not *res adjudicata*, the defendant being entitled
as a matter of right to another trial, the rule of *stare
decisis* applies with peculiar force to that decision. A
single objection to the state's title was considered on that
appeal, *i. e.*, the objection that the tax sale was in part
for school taxes assessed by the trustees of school district
No. 2 in the town of Harrietstown for the years 1869 and
1870 upon lands which were outside the school district.
Of course such an assessment was void. The fact is
found, as it was before, that land so assessed was out-
side the district, and the question which survives the
unanimous affirmance of the Appellate Division is pre-
sented by the exception to the admission of the evidence
upon which that finding was based. We are of the
opinion that there has been a substantial change in the
record which presents that question in an entirely different
light.

The evidence upon the former trial to establish the
boundaries of said school district consisted of pages 107
and 108 of a book of town records. Those two pages
were offered in evidence and were printed in the record
on appeal as a single document and, as thus offered and
printed, they purported to constitute the record made by
the town clerk on the 29th of April, 1862, of a single
order made and signed by the school commissioner,
defining the boundaries of districts Nos. 2 and 3 of said
town of Harrietstown. While the defendant objected to
the admission of the document in evidence, it did not
argue the exception to the ruling in this court, but, on
the contrary, conceded that there was some evidence, and
that the book of records indicated, that about the year
1862 an attempt was made by the official upon whom the
duty devolved to make the limits of the district coincide
with a "three mile circle," which, as is conceded, would
have excluded most of the land assessed. The argument
of the attorney-general was that, although the bound-
aries of the district had thus been defined in 1862, there

was a presumption from the fact of the levying of the taxes by the school trustees in 1869 and 1870 that an order had been made by the school commissioner, subsequent to the order of 1862, changing the boundaries of the district so as to include the land assessed. Judge GRAY, writing for this court, effectually disposed of that argument by observing that "In the absence of such a record, or of competent proof *aliunde*, establishing the making of such a change, it will not do to indulge in presumptions that such a change had been ordered, to make available the permissive terms of the amending statute." (*Saranac L. & T. Co.* v. *Roberts*, 195 N. Y. 303, 310.) The important question, argued by the state, related to the construction and effect of chapter 448 of the Laws of 1885, and the point finally determined by this court was that the short limitation period prescribed by that act was not set running as to actions by a landowner to dispossess the state of lands acquired through tax sales until the comptroller was deemed to be in possession thereof by reason of the advertisement of such lands pursuant to chapter 453 of the Laws of 1885. Judge GRAY pointed out that the decision of the United States Supreme Court hereinbefore referred to was based on an erroneous assumption as to the construction and effect of the six months' limitation clause of said chapter 448 and was not *stare decisis*. The decision of this court on the former appeal should not be regarded as *stare decisis*, if it was based on the erroneous assumption of fact that an order was made by the school commissioner in 1862, defining the bounds of said school district so as not to include a part of the land assessed. The state should not be prejudiced on a new trial, to which it was entitled as a matter of right, or be deprived of its land, by the fact that evidence was admitted on the former trial and printed in the record on appeal in such a way as not fairly to present the question involved.

Even on this trial, the learned counsel for the respond-

ent offered pages 107 and 108 of the town record as one document, and insisted that they constituted the record of a single order made by the school commissioner. The two pages, however, were received as separate documents. Facsimiles of them are printed in the record, and the original book was submitted for our inspection. Page 108 purports to be the record of an order made April 29th, 1862, by the school commissioner, defining the bounds of school district No. 3, Harrietstown. It is entitled: "In the Matter of defining and describing the bounds of School District No. 3, of the town of Harrietstown in the county of Franklin," and then proceeds: "It is ordered by the undersigned school commissioner," etc. The record is attested by Van B. Miller, town clerk. The writing on the preceding page 107 is entitled: "In the matter of defining and describing the bounds of School District No. 2, in the town of Harrietstown in the County of Franklin." But it does not purport to be the record of the whole or any part of an order made by the school commissioner. After the title, it proceeds thus: "The bounds of said district are as follows." Then follows on the first half of the page a description dated "Oct 5th/68" and signed "Van Buren Miller, Supervisor." Diagonal lines, commencing below the words "The bounds of the said district are as follows" are drawn through that description, and, following the signature and on the last half of the page, is another description dated "Oct. 5*th*/68" and signed "Van Buren Miller." The referee found that Van Buren Miller was town clerk in 1862, justice of the peace in 1867 and supervisor in 1868; that James Fillbrook was town clerk in 1868; that page 107 was written by Van Buren Miller in 1868, and that page 108 was written by him in 1862; that said pages did not constitute in any sense the same instrument, and that page 107 is not a copy of an order signed by any school commissioner, and does not in its form purport to be an order establishing or defining school district bounds, and

that the writing on page 107 is not attested by the town clerk and was not written by him. Those findings and the exception to the admission in evidence of page 107 present a question not involved on the former appeal.

Chapter 555 of the Laws of 1864 was a revision and consolidation of the general acts relating to public instruction. By it it was made the duty of the school commissioner to divide his district so far as practicable into a convenient number of school districts, to describe and number the school districts and joint districts and to deliver in writing to the town clerk the description and number of each district lying in whole or in part in his town, and from time to time to inquire and ascertain whether the boundaries within his districts were definitely and plainly described in the records of the proper town clerks. It was made the duty of the town clerk to receive, file and record the descriptions of the school districts and neighborhoods and all papers and proceedings delivered to him by the school commissioner. The record of school district boundaries made by the town clerk imports verity perforce of his official duty to make it. If made without authority of law or by a person having no duty to perform it would be mere hearsay. (Wigmore on Evidence, vol. 3, § 1633, subd. 8; *Browning* v. *Hanford,* 5 Denio, 586; *Board of Water Comrs.* v. *Lansing,* 45 N. Y. 19; *Parr* v. *Village of Greenbush,* 72 N. Y. 463.) It is argued that, while it was the duty of the town clerk to record the description delivered to him by the school commissioner, it was not necessary for him actually to do the writing. It may be assumed that the town clerk could have employed a scrivener, that in the absence of evidence to the contrary it would be presumed, from the mere fact that the writing appears in the book kept for the purpose of recording school district boundaries, that it was made by the town clerk, and that that presumption would not be overcome merely by showing that the handwriting was that of another person. The difficulty, how-

ever, is that this document does not purport to be a record, made by or with the authority of the town clerk, of a document delivered to him by the school commissioner, but on its face purports to be only a writing made by Van Buren Miller, supervisor, six years after the record on the succeeding page was made by him as town clerk. To show that he did not assume to act for or with the authority of the town clerk, he signed the writing himself, and to one signature added his official title. It was evidently assumed by Mr. Justice COCHRANE, who wrote for the Appellate Division on the former appeal, that the signatures and dates on page 107 were mere interpolations, but we now have the undisputed evidence and the findings to the contrary. Moreover, there is internal evidence showing that the writing was not the record of a description contained in an order furnished by the school commissioner. Unlike the record on the succeeding page, it does not purport to be the record of such an order. It is quite true, as the learned counsel for the respondent says, that the town clerk did not need to record the whole order, as he did on page 108, but only the description. However, his duty was to record what was delivered to him, and not to make up a description of his own. A critical examination of page 107 explains why the lines were drawn through the first description. At the end of each description the writer defined the location of the schoolhouse thus: "Said Schoolhouse stands 34 chs & 50 links from the Essex & Franklin County line on No. 21, and 20 chs & 50 links from the north line of No. 24." Lot 21 was next north of 24, and their east boundaries coincided with the line between Essex and Franklin counties. The author of the description began at the northeast corner of township 24, ran the boundary south along the county line, a distance stated, and then undertook to trace a three-mile circle, having the schoolhouse as its center. But he stopped the arc of the circle when he reached the line between townships 21 and 24, and

described the north boundary line thus: "Then south 88° east on the line of 21 & 24, 274 chs & 50 links to the place of beginning." He then evidently discovered that he had described a district the boundaries of which did not take in the schoolhouse, hence the lines through that description. His second description is the same as the first to the point where the arc of the circle intersects the line between townships 24 and 21. He then continued the circle on township 21 to a point named, and ran a line thence east to the county line and thence south between township 21 and Essex county to the place of beginning. Manifestly, the description of the northern boundary line, hereinbefore quoted, was not copied from any description furnished by the school commissioner, and it is inconceivable that in making a copy an entirely different description could be substituted by mistake. The document, then, was not a record made in the book in regular order; it does not purport to have been the record of a description delivered to the town clerk by the school commissioner but contains internal evidence, showing almost to a demonstration that it was not the record or copy of some other document; it was not made by the official whose duty it was to make it, but was made, and purports to have been made, by an official having no duty to perform in the premises. The presumption, then, arising from the fact of its entry in the proper record book was conclusively rebutted by facts appearing upon the face of the document itself. It was but the hearsay statement of Van Buren Miller, and was entitled to no probative force. The exception to its admission in evidence was well taken and requires a reversal of the judgment.

The fact undoubtedly was that Van Buren Miller, who apparently undertook to discharge the duties of every officer in the town, discovered, when he became supervisor, that there was no record in the town record book of the boundaries of school district No. 2, and so he undertook to supply the deficiency by composing a description

according to the old "three mile circle" rule. It seems to have been assumed that that was a rule limiting the boundaries of school districts, but in fact it limited only the non-resident property within the district liable to taxation. The language of the statute defining the taxable non-resident property of the district was: "and upon all real estate lying within the boundaries of such district, the owners of which shall be non-residents, and which shall be liable to taxation for town or county purposes and shall be situated within three miles of the site of the school house in such district." (See Laws of 1841, § 19, chap. 260; Laws of 1847, § 85, chap. 480; Laws of 1864, § 66, chap. 555.) The phrase "within three miles," etc., was omitted by the amendment of 1865 (Chap. 647 of the Laws of 1865), three years before Van Buren Miller, supervisor, undertook to define the boundaries of school district No. 2 according to it.

It might be suggested that, with the record just considered out of the case, there is no evidence to show what the boundaries of said school district No. 2 were. In the first place, it was for the plaintiff, who is attacking the state's title, to show the invalidity of the assessment. In the second place, there is evidence to show that school district No. 2, Harrietstown, did in fact include not only all of township 24 as well as a part of township 21, but also all of township 27, which was next south of township 24. On the 21st day of October, 1870, the school commissioners of the first commissioner districts of Franklin and Essex counties, with the consent of the trustees of the school districts affected, made an order consolidating district No. 2 of the town of Harrietstown, Franklin county, and district No. 4 of the town of North Elba, Essex county, to form a joint school district. The order describes the district thus formed so as to include all of townships 24 and 27 and a part of township 21, Harrietstown. The non-resident land, thus included, agrees exactly with that described in the return of unpaid taxes

by the collector of district No. 2, Harrietstown, the warrant for the collection of which was delivered to him by the trustees on July 25th, 1870. It was the business of the school commissioner to know the boundaries of the school districts in his commissioner district, and of the school trustees to know the boundaries of their districts. It seems to have been assumed that the order of 1870 was one changing the boundaries of school district No. 2, Harrietstown, but in truth, as already stated, it was an order consolidating that district with district No. 4, town of North Elba, Essex county, and the fact that it was made on the consent of the trustees of said two districts only, together with the fact of the prior assessment by the trustees of school district No. 2, Harrietstown, of the non-resident land in townships 24 and 27, is cogent evidence to show that at some time prior thereto the boundaries of school district No. 2, Harrietstown, had been so defined as to include said townships. The evidence was sufficient to justify a finding to that effect, at least in the absence of proof by the record that said boundaries had been defined in a different way.

It remains to consider the other objections to the state's title, which I shall state and discuss under separate heads.

1. That the return by the collector of unpaid school taxes for the year 1870 was not verified.

The finding of the referee under this head was that the return "was not accompanied by any affidavit made by him" (referring to the collector) "that such account was correct and true or that taxes therein stated were unpaid or otherwise." That finding was based on the return itself to which was attached an affidavit signed by Daniel S. Bartlett, the collector. Bartlett was called as a witness for the plaintiff, and on cross-examination testified in substance that according to his recollection — naturally after the lapse of so many years it was not very distinct — he signed and swore to the affidavit before a justice of the peace. The neglect of the justice to affix his signa-

ture to the jurat was at most an irregularity and insufficient to vitiate the subsequent proceedings based on the return.  It was not found that the affidavit was not in fact sworn to.  We have not, therefore, to determine the effect of a failure of the collector to make oath to the return.

2.  That the assessment roll of 1867 was verified August 10, 1867, before the third Tuesday of that month. The finding under this head is based on the copy of the roll, produced from the town clerk's office, the original filed in the county treasurer's office having been burned in 1873.  · A copy of an oath purporting to have been verified August 10 was attached to the copy produced.  The date, the names of the assessors and of the justice who purported to have administered the oath, were all in lead pencil and apparently in the same handwriting.  But assuming that the evidence, *i. e.*, the writing purporting to be the copy of an oath, was properly received and tended to show that the original roll was sworn to on August 10, that irregularity did not vitiate the subsequent proceedings and was cured by chapter 448 of the Laws of 1885.  The precise question on the identical assessment roll was involved in *People* v. *Turner* (145 N. Y. 451). That case was not overruled, upon the point decided, by the former decision of this court in this case as will be seen by reference to the opinions of Judge Gray who wrote in both cases.  · Again we have not to consider the effect of a total failure of the assessors to verify the assessment roll.

3.  That the sale in one parcel for the aggregate unpaid taxes of several years, which were not all assessed on the entire parcel as one tract, was void.  The northwest quarter was assessed as one parcel and thus described in 1866 and 1867: "Township 24, Great Tract No. 1, Macomb's purchase, N. W. ¼ * * * 7,500 acres."  It was assessed in two parcels in the years 1868, 1869 and 1870, thus: 1, "Township 24, Great Tract 1, Macomb's Purchase,

N. W. ¼, excepting 1,000a. lying in the N. W. cor.; also 1,215 which is water leaving  *  *  *  5,285;" 2, "Macomb's Purchase, Great Tract 1, Tp. 24, 1,000a. lying in the N. W. cor. of N. W. ¼  *  *  *  1,000 acres." The non-resident land in the northeast quarter was assessed in one parcel each year and was thus described in all but one year: "Township 24, Great Tract No. 1, Macomb's Purchase, Northeast ¼, excepting 400a. which is resident lying in the northeast corner  *  *  *  7,100 acres." In 1870 the description was the same down to the exception which in that year was "excepting 800a. resident in the N. E. corner," and the quantity assessed was stated to be 6,700 acres. There appears to have been a well-recognized parcel of 1,000 acres in square form in the northwest corner of the northwest quarter, described as such in different conveyances in the plaintiff's chain of title. As explanatory of the exception in the northeast quarter it appears that there was a tier of four parcels of resident land in the northeast corner 40 chains wide, north and south, and extending west two miles, containing 640 acres. That land was assessed to the occupants each year in the resident part of the roll, the aggregate quantity as stated being 420 acres. The west lot, hereinafter referred to as the Ring lot, was 40 chains square and contained 160 acres. The referee found that in the year 1870 one Blood occupied, under a supposed contract of purchase, 400 acres in the northeast part of the northeast section next to the east parcel in said tier of lots, that that was assessed to him as resident land in 1870, and that he paid the taxes thereon. That was doubtless the extra 400 acres excepted from the assessment of the non-resident land in that year. The supposed contract was not carried out. Since about 1852 there has been a well-marked surveyor's line along the south line of the 640 acres of resident land. One Norton and his grantors owned all of the unoccupied land in both quarter sections. I shall assume that the non-resident land in each was sold

in one parcel for the aggregate unpaid taxes assessed as aforesaid. The finding to that effect is based on the fact that each is described as one parcel in the comptroller's notice of sale, certificates of sale, deeds to the state, and notices to redeem. While the conclusion does not necessarily follow the premise, we must accept it as it has been unanimously affirmed. The east half of the northeast quarter was redeemed in 1879 by Moore and others, executors of Loring Ellis, deceased,. claiming under a pledge by Norton of a certificate of tax sale in 1871. The redemption diary in the comptroller's office stated the quantity redeemed to be 3,580 acres, but the comptroller evidently concluded subsequently that he had made a mistake and refunded the sum paid on the excess over 3,350 acres. The deed to the state of the unredeemed part describes it thus: "Macomb's Purchase, Great Tract one, Township twenty-four (24) Northeast one-quarter (¼), the West one-half (½) thereof, containing three thousand seven hundred and fifty (3,750) acres more or less."

It is unnecessary to discuss the authorities cited in support of the well-settled rule that different parcels, separately assessed, cannot be bunched on a tax sale. The sale must be so conducted that separate and distinct parcels may be redeemed by the payment of the taxes properly chargeable to each. But it is not to be overlooked that we are dealing with wild forest lands, lying in one body, all owned by one person and assessed at a uniform rate per acre. Any person claiming an undivided part or share, or a specific part, of any tract sold could redeem it by paying such proportion of the purchase price and interest as he might claim of the lands sold or as the number of acres sought to be redeemed might bear to the number of acres sold. (Laws of 1855 §§ 51, 52 and 53, chap. 427.) Even if there had been severalty of ownership there would have been no trouble in redeeming the thousand-acre parcel in the northwest quarter by the payment

of the amount properly chargeable to it.    It may be that if Blood had carried out his supposed contract to purchase the 400 acres in the northeast quarter, he would have had a grievance for the sale of that for the taxes of 1870.    But the inclusion of it with the parcel sold did not give the owner of the rest of the parcel a grievance, as that proportionally diminished the acreage price at which the rest could have been redeemed.    Moreover, the east half which included said 400 acres was in fact redeemed.    Title to the west half only is involved in this action.    The sale of the entire northwest quarter (7,500 acres) for the aggregate taxes assessed, although in three of the years there was an apparent exception of 1,215 acres as land under water, did not prejudice the rights of the owner.    It is plain that the intention was to assess the entire quarter and simply to deduct the land under water from the total upon which the amount of the assessment was computed at the acreage price.    The owner was thus benefited.    If there had been severalty of ownership, and if the land under water had been a distinct parcel either excepted from the assessment or separately assessed, the owner of it might have had a grievance for the sale of it with the rest of the quarter section for taxes which it was not liable to pay, but the owner of the latter would have been benefited, as he could then have redeemed his own for less than the amount properly chargeable to it.    And finally under this head the owner could have saved his land from sale and could have redeemed it after a sale by the payment of the taxes properly chargeable to it.    This is not a case in which it was necessary to pay the taxes of some other person in order to redeem.

4. That assessments were void for indefiniteness of description of the land assessed.    The finding as to that is labeled a conclusion of law, as, indeed, it may well be.    It is based on the exception of the 400 and 800 acres respectively in the northeast quarter and the 1,000 acres and the 1,215

acres in the northwest quarter. The intention plainly was to assess all of the unoccupied land in each quarter. If the exception was uncertain it might be rejected, but that would not necessarily avoid the assessment. Moreover, enough has already been said to show that there was no uncertainty. That is certain which is capable of being made certain. The redemption of the east half of the northeast quarter cured any uncertainty as to the precise location of the 400 acres excepted from the nonresident land and assessed to Blood in 1870; and even if the 1,000 acres in the northwest quarter separately assessed in 1868, 1869 and 1870 could not be definitely located, the result would be the same as though the entire quarter had been assessed in one parcel as would have been proper. A mistake in stating the number of acres of resident land or of land under water, considering the latter as excepted from the land assessed, would not present a question of indefiniteness of description. The land was easily located.

A description as to quantity is one of the least important matters even in a grant. Assessors cannot be expected to describe the land assessed by metes and bounds, courses and distances, and there would not be space enough in the roll even if they were able and had the time to do it. If a mistake was made in the quantity of land assessed the remedy of the owner was before the assessors or the board of supervisors.

5. That resident land was improperly assessed as nonresident, and was included in the land conveyed to the state by the tax deed, but no notice to redeem was served on the occupant. This objection relates to the Ring lot, 36 acres of which was west of the north and south line of equal division of the northeast quarter. No such line had ever been run. There was, however, a well-marked surveyor's line parallel with and west of the line of equal division, and its north end coincided with the west line of the Ring lot. That probably accounts for the acreage as

stated in the comptroller's diary, of the east half of the quarter which was redeemed. Although the contrary has been adjudicated (*People* v. *Hall*, 43 Misc. Rep. 117; 105 App. Div. 636), the referee found that that redemption and the deed to the state of the west half of the quarter were made with reference to a line of equal division. But that is unimportant. The Ring lot was assessed to the occupant. The fact that the assessors thought there was only 100 acres in it does not show that any part of it was assessed as non-resident land or included in the sale of such land; and even if it was included in the land conveyed to the state, the plaintiff could not appropriate the grievance of the owner.

6. That the assessments for certain years were void for failure of the assessors to comply with the statute (§ 13, chap. 13, pt. 1, tit. 2, R. S., 5th ed.) governing the form and manner of making up the roll. This objection is highly technical. Again it must be borne in mind that we are dealing with wild forest land. There is no pretense that the quarter sections had been subdivided. Indeed the learned counsel for the respondent concedes that the quarter township was the proper unit of assessment. Sections 11, 12 and 13, chapter 13, part 1, title 2, of the Revised Statutes (5th ed.) provided how non-resident land should be assessed. As the quarter section was a tract not subdivided, section 13 applied. Subdivision 3 thereof provided: "If the quantity to be assessed be the whole tract, such a description by its name or boundaries will be sufficient; but if a part only is liable to taxation, that part or the part not liable, must be particularly described."

This objection relates to the northwest quarter, and, if I understand it, is that the separate assessment of the thousand-acre parcel and the exception of the 1,215 acres of land under water were improper for the reason that the whole quarter section should have been assessed as one parcel, and that if any part was to be excepted or

separately assessed, it or the part assessed should have been "particularly described." As has already been shown, the separate assessment of the thousand-acre parcel in no way prejudiced the rights of the owner, and the exception of the 1,215 acres of land under water benefited him. The description of land excepted as land under water was quite sufficient to identify it, and if there was any indefiniteness with respect to the thousand-acre parcel, it was of no consequence for the reason that the practical result was the same as though the entire quarter had been assessed as one parcel.

There was a failure to comply with subdivision 1 of section 13 with respect to certifying that the tract was not subdivided or that the assessors could not obtain correct information of the subdivisions. The purpose of that requirement was to insure that where land was subdivided the lowest subdivision should be the unit adopted for assessment. Concededly in this case that was done, and the failure of the assessors to make the certificate was not of the slightest consequence to the owner.

7. That the return of unpaid taxes by the county treasurer to the comptroller for the years 1866 and 1869 did not specify or identify the taxes returned with those imposed for each of those years. The certificates by the county treasurer to the return of unpaid taxes were made on blank forms, and he neglected to insert the final numeral in the blanks in the body of the certificates after the figures 186. One certificate was dated January 23rd, 1867, and the other March 4th, 1870. Those dates plainly showed the year for which the return was intended. The statute made it the duty of the county treasurer to transmit the account of unpaid taxes to the comptroller before the first day of April next ensuing the receipt by him of the collector's account. (Laws of 1855, chap. 427, § 4,)

I have now considered all of the objections to the state's title which able counsel have discovered during a litiga-

tion which has lasted eighteen years. A substantial compliance with the requirements of the statute imposed for the taxpayers' benefit is of course necessary to the validity of an assessment or a tax sale based thereon. But it would be practically impossible to enforce payment of taxes on non-resident land in some counties of the state if trifling defects and technical omissions were sufficient to avoid tax deeds. Much confusion of thought has been caused by attempts to draw distinctions between irregularities and so-called jurisdictional defects. As was pointed out by Chief Judge Cullen in *People* v. *Inman* (197 N. Y. 200), the question in cases like this is whether the proceedings upon which the tax sale was founded were so fatally defective that no title passed. If so, the title of the owner cannot be transferred by an act of the legislature though a Statute of Limitation affording him a reasonable opportunity to assert his rights may bar a remedy. Save for the single objection which the change in the record has now removed from the case none of the alleged defects or irregularities complained of could have prejudiced the rights of the owner in the slightest degree, and, in my opinion, none of them are sufficient to vitiate the state's title even without the aid of a curative statute.

The judgments should be reversed and new trials granted, with costs to abide the event.

Cullen, Ch. J., Chase, Cuddeback and Hogan, JJ., concur; Gray and Willard Bartlett, JJ., dissent.

Judgments reversed, etc.