In the Matter of the Petition of SAMUEL M. MEEKER for the Settlement of His Intermediate Account as Successor Trustee under the Last Will and Testament of AUGUSTUS A. LEVERICH, Deceased.*

Surrogate's Court, Kings County, December 2, 1929

* See also 136 Misc. 22.

*John C. Loud,* for the petitioner.

*William H. Good,* for A. Lyle Leverich and Maude E. Leverich.

*Charles J. McDermott,* for claimant Christopher W. Wohlers.

*Martin Lippman,* for claimant American Bond and Mortgage Company.

*Sidney Jarcho,* for Jarcho Bros., Inc., judgment creditor.

*Gray & Tomlin,* for claimant Brooklyn Trust Company.

*Harold Dudley Greeley,* for Cameron Leverich.

*Abraham Glaser,* for trustee in bankruptcy of A. Lyle Leverich.

*Coombs & Wilson,* for John T. Stebe and Mary Elizabeth Greene.

*Forrest S. Chilton,* for Benjamin Groberg.

*Myers & Sherwin,* for Greer Electric Construction Co., Inc., judgment creditor.

*D. Edward Meeker,* for William H. C. Leverich.

*George L. Naught,* for American Surety Company of New York.

*Andrew S. Derby,* special guardian, for Leverich infants.

WINGATE, S. Augustus A. Leverich, Sr., died on January 8, 1885, leaving a will which was probated in this court on February 3, 1885. By its second item a trust was erected, the income of which was to be paid to testator's wife, Phebe E. Leverich, for life. On her death the principal was to be divided into equal shares, one of which was to be held for each of testator's surviving children, or issue of a deceased child. On the death of each such child, the corpus of the trust set up for it was directed to be paid over absolutely to the issue of such child. Testator was survived by his wife, who died on July 23, 1901. At the time of her death their three children were living, namely, William H. C. Leverich, who is still living, Mary A. Nienstadt, who died October 14, 1924, and Augustus A. Leverich, Jr., whose death on December 22, 1928, precipitated the present controversy.

Upon the death of the widow, the trust fund was divided into three parts, as directed by the will. The share of Mrs. Nienstadt was distributed pursuant to a decree of this court dated June 4, 1925. The proper distribution of the second share, set aside for the life of Augustus A. Leverich, Jr., is the subject-matter of the instant determination.

Augustus A. Leverich, Jr., was survived by his son, A. Lyle Leverich, and an only grandson, A. Lyle Leverich, Jr. A part of the distributive remainder of this trust is claimed on behalf of the latter, and claims to all or part of the fund have also been interposed

on behalf of the American Bond and Mortgage Company, Christopher W. Wohlers, Benjamin Groberg, as receiver in supplementary proceedings of the property of A. Lyle Leverich, Sr., by Willis E. Roys, his trustee in bankruptcy, and by Samuel C. Pulis, the receiver appointed in a judgment creditor's action against the estate of Augustus A. Leverich, Jr.

Before reviewing the facts upon which the last five claimants base their rights, it will be of advantage to consider the contention made on behalf of A. Lyle Leverich, Jr. This is founded upon the argument that a proper construction of the will of Augustus A. Leverich, Sr., will result in a determination that the final distributive direction of the pertinent item of the will must result in a holding that, upon the death of Augustus A. Leverich, Jr., such remainder is distributable to his son, A. Lyle Leverich, and his grandson, A. Lyle Leverich, Jr., in equal shares; the distribution intended being not stirpital, but *per capita.*

This contention was advanced at the time the will was previously before this court for construction and was passed upon on May 25, 1925. (*Matter of Leverich,* 125 Misc. 130.) On that occasion this court felt constrained to hold that it directed a stirpital distribution. In view of the comprehensive consideration given the question at that time, it will not now be repeated. Suffice it to say that, whereas, at the time the will was probated, it was undoubtedly the law that a presumption existed in favor of a *per capita* distribution, it was also recognized that the rule was based upon a regrettable subservience to early English decisions, which never had any historical justification in this country (*Petry* v. *Petry,* 186 App. Div. 738; affd., *Petry* v. *Langan,* 227 N. Y. 621), and that " the presumption yields to ' a very faint glimpse of a different intention.' " (*Matter of Farmers' Loan & Trust Co.,* 213 N. Y. 168, 174; *Ferrer* v. *Pyne,* 81 id. 281, 284; *Vincent* v. *Newhouse,* 83 id. 505, 513; *Bisson* v. *West Shore R. Co.,* 143 id. 125.) After a very careful consideration given to the question at that time the court decided that a different intention was manifested by the testator in the present will, and it sees no reason to reconsider that determination.

Even were the court of a different opinion, it would have grave doubts as to the propriety of reopening the question at this late date. All of the parties now in interest under the will, including A. Lyle Leverich, Jr., on whose part the contention is advanced, were then present and participated in the determination. No appeal was taken from the construction reached. While the question at that time concerned particularly the third of the original trust which had been appropriated for Mrs. Nienstadt, the direction

for its distribution involved the identical questions of construction now raised. It is believed, therefore, that those questions are *res adjudicata*, within the spirit, if not of the letter of the term. While no authority to that effect is known to the court, it is conceived that a construction of a will is to be considered as a proceeding *quasi in rem*, since it cannot be questioned that on many occasions, as in the present instance, large sums of money change hands in reliance upon a construction to which all interested persons were parties and in which all have acquiesced.

Whether or not the question may be considered *res adjudicata*, the princple of *stare decisis* undoubtedly applies. (*Saranac Land & Timber Co.* v. *Roberts*, 208 N. Y. 288; *People* v. *Santa Clara Lumber Co.*, 213 id. 226; *Matter of Grifenhagen* v. *Ordway*, 218 d. 451.) The principle enunciated by the court in the last-cited decision applies equally to this court in the instant case. It says (at p. 458): " We should not undermine the law by reversing a decision of this court unless it has been demonstrated to be erroneous through the failure by us to consider a statute, prior decision, material fact or other substantial feature, or unless through changed conditions it has become obviously harmful or detrimental to society — a condition the Legislature will very rarely suffer to exist. Certainty is of the very essence of the law. Shifting and changing rules or principles do not constitute law. The avoidance or prevention of litigation through the establishment by the courts of fixed and certain rules is a useful and beneficent effect of the litigations had.'

In the instant case it is unquestionable that two of the parties have advanced several hundreds of thousand dollars on the faith of the rights of A. Lyle Leverich under this will, as determined on its former construction. Having acquiesced in the former decision of the court, the parties thereto should be held equitably estopped to contend that such determination should be reversed after this considerable lapse of time.

Turning now to the facts of the case as disclosed by the record, we find that some time prior to December 1, 1925, A. Lyle Leverich, Sr., embarked upon the promotion of the " Leverich Towers," a hotel to be erected on Brooklyn Heights. On this date the plot had been assembled and certain work had been done in forwarding the enterprise. Various lens had been created, aggregating in excess of $200,000. For the conduct of the project, Leverich had incorporated certain companies, the principal one, Leverich Realty Corporation, owning the stock of the others. On December 1, 1925, the subsidiary which held title to the land executed a trust mortgage of $2,500,000 to certain trustees, and simultaneously entered into a brokerage agreement with the American Bond and

Mortgage Company relating to the underwriting of the bond secured by the mortgage and to their advance of the money for the prosecution of the enterprise. Simultaneously with the execution of these documents, Leverich executed, acknowledged, and delivered to the American Bond and Mortgage Company an additional document reading as follows:

"*December* 1, 1925.

"I, the undersigned, in consideration of one dollar and other good and valuable considerations, and as an inducement for the American Bond & Mortgage Company to extend credit out of its own funds to the Brookhold Construction Company, Inc., and the Leverich Realty Corporation and myself, or either of these corporations, at my request, do hereby sell, assign and transfer all my rights, title and interests in and to my vested interest in the estate of Augustus A. Leverich, deceased, of which S. M. Meeker is substituted trustee (217 Havemeyer St., Brooklyn N. Y.), to the American Bond & Mortgage Company, and in consideration of the aforesaid considerations, I do also sell, assign, and transfer all my rights, title and interests in and to my interest (whether contingent or vested) in the estate of Phoebe E. Leverich, deceased, of which Augustus A. Leverich, my father, is executor or trustee (449 McDonough St., Brooklyn, N. Y.), to the American Bond & Mortgage Company. These assignments are made in conjunction with the financial statement that I am rendering of my personal worth dated to-day and delivered herewith."

At the time of the closing, the American Bond and Mortgage Company paid off the accrued liens, but whether the money for this purpose was paid from its own funds or was derived from the sale of bonds does not appear, except from a recital clause in the brokerage agreement which states that the latter was the case. The hotel was completed, and began operation in 1927, but apparently encountered financial difficulties from the start. In any event, recitals in an agreement between Leverich and Wohlers dated December 30, 1927, which will be considered at length somewhat later, indicate that on that date the enterprise was at least on the verge of insolvency.

In February, 1928, the mortgage interest and amortization then due was not paid, and was advanced by the American Bond and Mortgage Company, upon receipt of a four months' note of "Brookhold Construction Company, Inc., the subsidiary holding the fee, and indorsed by Leverich Realty Corporation, A. Lyle Leverich, and Christopher Wohlers. This note was not paid at maturity and a judgment was recovered. Wohlers paid the judgment, which

amounted to $152,639.78. About the same time, on February 23, 1928, the American Bond and Mortgage Company, at Leverich's request, paid insurance items on the property, amounting to $5,921.89, which have never been repaid to it.

On June 11, 1928, Jarcho Bros., Inc., recovered a judgment aga nst Brookhold Construction Company, Inc., Leverich Realty Corporation, A. Lyle Leverich, and Augustus A. Leverich, in the sum of $26,140.14, upon which Benjamin Groberg was appointed receiver of the assets of A. Lyle Leverich in proceedings supplementary to execution on December 5, 1928. This same creditor recovered a second similar judgment in the sum of $10,396.58 on November 23, 1928, to which the receivership was extended by order filed January 7, 1929. Apparently other judgments were recovered subsequently, the details of which were not made to appear upon the hearing.

On May 1, 1929, an involuntary petition in bankruptcy was filed against A. Lyle Leverich in the United States District Court for the Eastern District of New York, and he was subsequently adjudicated a bankrupt, and William E. Roys was elected trustee in bankruptcy and duly qualified as such. Finally, on June 26, 1929, Samuel C. Pulis was appointed receiver in a judgment creditor's action in the Supreme Court against the executor of Augustus A. Leverich, Jr., and the trustee of the trust fund created by the will of Augustus A. Leverich, Sr. It has been stipulated that Christopher Wohlers has paid out the sum of $252,109.74 pursuant to the terms of his agreement with Leverich, no part of which has been repaid.

The question of transcendent importance at the outset of the consideration of the rights of the parties is the effect to be given to the agreement, dated December 30, 1927, between A. Lyle Leverich and Christopher W. Wohlers. This document provides in substance as follows:

The preamble clauses recite that Leverich is and for some time has been the president and controlling factor of Leverich Realty Corporation, and owner of its class B, and of 15,000 shares of its class A, common stock; that at his request Wohlers has invested in the class A and preferred stocks, and has become a director of the company, but has never taken any active part in its management; that its working capital is insufficient, and that debts owing by it and its subsidiaries, Brookhold Construct on Company, Inc., and Hotel Leverich Operating Company, Inc., remain unpaid; that Leverich has requested Wohlers to loan money and credit to these corporations and to become chairman of the board of directors and assist him in managing Leverich Realty Corporation  The agreement then proceeds:

*First.* That Wohlers will indorse a three months' note of Leverich Realty Corporation, indorsed by Leverich, and procure the money thereon by virtue of his credit, and use the proceeds for the benefit of Leverich Realty Corporation and the subsidiary companies; that he will use his best endeavors to assist in raising further moneys for Leverich Realty Corporation; that he will accept the chairmanship of its board of directors and devote a certain part of his time to such duties; that he will assist Leverich in the management of the corporation, acting chiefly in an advisory capacity in connection with financial matters.

*Second.* Leverich agrees to co-operate fully with Wohlers in the management of the company and its subsidiaries, to continue as president, and devote his entire time to its affairs. Leverich then " further covenants and agrees as follows: "

(1) To give half of all his class A common stock to Wohlers.

(2) To deposit with a mutually agreeable depository all his class B common stock, to be so held until all indebtedness of Leverich Realty Corporation and its subsidiaries and all investments, except the class A stock mentioned in (1) have been repaid to Wohlers; that Leverich shall not sell, mortgage or pledge any of such class B stock without giving Wohlers a thirty-day option to take it over on the same terms.

(3) So long as the class B stock remains deposited, to vote it against any proposition which might vary the rights of the class A stock, in the absence of Wohlers' written consent thereto.

(4) To vote the class B stock in favor of mortgage or sale of property owned by the corporation when mutually agreed to be necessary to effect a proper financing plan.

(5) To assist in electing Wohlers and another members of the executive committee of Leverich Realty Corporation, and to do everything possible to enable Wohlers to supervise the financial policies.

Then follows the paragraph, the proper construction of which is in dispute:

" (6) That he will not mortgage, sell or hypothecate any part of his interest which may be vested or contingent, to which he may be entitled, in the estate of his paternal grandfather, Augustus A. Leverich, deceased, late of the county of Kings, of which S. M. Meeker 's trustee, and to hold the same as collateral security for the benefit of said second party, until any and all loans which he may make to Leverich Realty Corporation, or or their benefit, shall have been repaid in full, or upon default in such payment, as a fund out of which such obligations may be paid."

The following paragraph reads in part as follows:

" It s the mutual purpose and intent of this agreement to set forth the understandings between the parties for their mutual benefit and to outline the methods of co operation to be maintained between the parties for conducting the business of Leverich Realty Corporation, giving mutual protection to the parties hereto one with the other, with the further understanding and agreement that they shall co-operate and share equally in all profits which may arise out of their mutual relationships not inconsistent with their duties as officers and directors of said Leverich Realty Corporation."

The final clauses concern salaries to the parties, compensation to members of the executive committee, and retainer of attorneys. The agreement is made binding upon the personal representatives of the parties, is sealed, and bears an acknowledgment dated December 31, 1927.

Reduced to their lowest terms, the provisions of this document envisage a state bordering on substantial insolvency of the enterprise, place Wohlers in the position of financial dictator in return for a salary of $15,000 a year, and arrange that he shall lend his credit in an attempted salvage of the properties, subject to indemnity from the interest of Leverich in his grandfather's estate. In return Wohlers is to receive half of Leverich's class A stock in the enterprise, to which, it is hoped, he may give value.

That Wohlers performed his part of the agreement seems to be beyond question. Unfortunately for all concerned, he was unsuccessful in guiding the enterprise off the financial rocks. In his attempt to do so, he incurred obligations and made payments well in excess of the total value of Leverich's interest in his grandfather's estate. He now seeks to have the promised indemnity applied in mitigation of his losses, and the legal propriety of such a direction is the crux of the case. The application of the distributive interest, as such indemnity, is resisted by the American Bond and Mortgage Company, which claims the fund by virtue of the prior unrecorded assignment by Leverich's receiver in supplementary proceedings, who, as noted, was appointed as such on December 5, 1928, almost a year subsequent to the date of this agreement, and by Leverich's trustee in bankruptcy, whose election was confirmed on September 27, 1929, the petition in bankruptcy having been filed on May 1, 1929

Since it is elementary that a receiver in supplementary proceedings succeeds only to the property which the judgment debtor possessed at the time of his appointment (*Dubois* v. *Cassidy*, 75 N. Y. 298, 302; *Masten* v. *Amerman*, 51 Hun, 244; *People ex rel. Duvall* v. *Cocks*, 162 App. Div. 453, 455), it becomes a matter of prime importance to determine the effect, if any, which the agree-

ment of December 31, 1927, had upon Leverich's ownership of this part of the residue of his grandfather's estate.

The claimant earnestly maintains that subparagraph (6) of paragraph " Second " of the agreement amounts to an equitable assignment by Leverich to Wohlers of the interest which the former had as a remainderman under his grandfather's will. The court is unable so to construe this language, and reads many of the authorities cited in favor of such a construction as pointed adjudications in opposition.

Disregarding for the moment the unrecorded assignment to the American Bond and Mortgage Company, it is unquestionable that at the time of the making of this agreement, A. Lyle Leverich was the owner of a vested interest in this remainder. (Real Prop. Law, § 40; *Moore* v. *Littel*, 41 N. Y. 66, 76, 77, 79, 80; *Matter of Steinwender*, 176 App. Div. 517, 519; affd., 221 N. Y. 611; *Matter of United States Trust Co. of New York*, 179 App. Div. 923; affd., 223 N. Y. 617; *Stringer* v. *Young*, 191 id. 157, 161; *Matter of Haggerty*, 128 App. Div. 479, 480, 481; affd., 194 N. Y. 550; *Matter of Terwilligar*, 135 Misc. 170; *Matter of Woodruff*, Id. 203.) This was a future estate in expectancy (Real Prop. Law, §§ 36, 37), and as such was alienable. (Real Prop. Law, § 59; *Bergman* v. *Lord*, 194 N. Y. 70, 75; *Rothschild* v. *Schiff*, 188 id. 327, 333, modifying *Rothschild* v. *Goldenberg*, 103 App. Div. 235; *National Park Bank of New York* v. *Billings*, 144 id. 536, 540, 545; affd., 203 N. Y. 556.) In other words, Leverich had it in his power to assign it in whole or in part. Did he equitably assign it to Wohlers by this instrument? Reviewing some of the leading decisions on the subject, we find the following expressions:

" The test of an equitable assignment is the inquiry whether or not an assignment makes an appropriation of the fund, so that the debtor would be justified in paying the debt or the assigned part to the person claiming to be the assignee." (*Hinkle Iron Co.* v. *Kohn*, 229 N. Y. 179, 183.) (See, also, *Fairbanks* v. *Sargent*, 117 N. Y. 320, 330.)

" To constitute a valid assignment there must be a perfected transaction between the parties intended to vest in the assignee a present right in the thing assigned. An agreement to pay a certain sum out of, or that one is entitled to receive, from a designated fund, when received, does not operate as a legal or equitable assignment, since the assignor in either case retains control over the subject-matter." (*Donovan* v. *Middlebrook*, 95 App. Div. 365, 367.)

" An equitable assignment does not exist where an assignor retains any control over the fund, or any authority to collect, or

any power to revoke." (*Farmers' Loan & Trust Co.* v. *Winthrop*, 207 App. Div. 356, 362.)

Applying these principles to the language of the 6th subparagraph, we see that Leverich agrees: (1) Not to mortgage or sell any part of his interest. (2) To hold it as collateral security for Wohlers. (3) In case of default by the corporations, to hold it as a fund out of which their obligations to Wohlers may be paid.

By no reasonable interpretation of the language used can it be held that Leverich released all control over the fund. Two of his three covenants expressly negative this idea, since they stipulate that he shall "*hold*" it. The covenant against sale or hypothecation evidences a like intention, which is to the effect that the right shall remain in Leverich, but that *he* shall be restrained from dealing with it in a manner inimical to Wohlers' interests, which, obviously, he would be unable to do were he divested of all rights in the *res*. Certainly, on this showing, it could not be said that the trustee, Meeker, would have been protected in making payment of the fund to Wohlers without the intervention of Leverich, within the language of the *Hinkle* case. On the other hand, it is an express agreement by Leverich on certain conditions to pay to Wohlers from a designated fund within the *Donovan* case.

While, however, it is entirely apparent to the court that there was no intention by the language used to vest the fund in Wohlers, it is equally obvious that the parties did intend that he should have a paramount claim or lien thereon. In such a case the correct equitable rule is stated by Mr. Justice HOLMES in *Barnes* v. *Alexander* (232 U. S. 117, 120), as follows: " We start, however, with the principle that an informal business transaction should be construed as adopting whatever form consistent with the facts is most fitted to reach the result seemingly desired " (citing cases).

At page 121 of 232 United States: " * * * it is one of the familiar rules of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing [citing cases]. * * * The obligation of Barnes was as definitely limited to payment out of the fund as if the limitation had been stated in words, and, therefore creates a lien. * * * It is not necessary to consider whether the lien attached to what we have called the *res*, before the fund was received, as a covenant to set apart rents and profits creates a lien upon the land. * * * It is enough that it attached not later than that moment." (See, al o, *Matter of Interborough Consolidated Corp.*, [C. C. A. N. Y.] 288 Fed. 334, 349, affg. [D. C.] 277 id. 249; certiorari denied, *Porges* v. *Sheffield*, 262 U. S. 752.)

This principle was recognized by our Court of Appeals in *Roe* v. *Vingut* (117 N. Y. 204), where Judge PECKHAM, after stating that the intent of the parties is to be gleaned from a reading of the whole instrument, said (at p. 212): " Upon such perusal, if a general scheme can be found to have been intended and provided for in the instrument, and such general scheme is consistent with the rules of law, and so may be declared valid, it is the duty of courts to effectuate the main purpose."

This language is quoted with approval and followed in *Hammerstein* v. *Equitable Trust Co. of New York* (156 App. Div. 644, 652; affd., 209 N. Y. 429).

In the instant case, as noted, Leverich agreed to *hold* his interest in his grandfather's estate as security for the advances to be made by Wohlers to the enterprise and, in the event of a default, as a fund from which payment should be made.

In conformity with the principles just noted, it has uniformly been held that any writing signed by the party to be charged, if it contains the necessary elements, is sufficient to establish an express trust. (*Day* v. *Roth,* 18 N. Y. 448, 453; *Young* v. *Young,* 80 id. 422, 438; *Matter of Schwartz,* 145 App. Div. 285, 287; *Matter of Hasbrouck,* 153 id. 394; appeal dismissed, 208 N. Y. 586; *Matter of Valentine,* 122 Misc. 486, 489, 490; *Noble* v. *Learned,* 153 Cal. 245, 251; *Korompilos* v. *Tompras,* [Mo. App.] 251 S. W. 80, 81; *Snyder* v. *Snyder,* 280 Ill. 467.)

As is said by the Court of Appeals in *Hoffman House* v. *Foote* (172 N. Y. 348, 355): " Trust relations will be implied when it appears that such was the intention of the parties and when the nature of the transaction is such as to justify or require it. (*Morse* v. *Morse,* 85 N. Y. 53; *Gilman* v. *McArdle,* 99 N. Y. 451; *Day* v. *Roth,* 18 N. Y. 448; *Matter of Carpenter,* 131 N. Y. 86; *Woodward* v. *James,* 115 N. Y. 346; *Gillet* v. *Bank of America,* 160 N. Y. 549.) "

No set form of words is needed to constitute a trust (*Day* v. *Roth,* 18 N. Y. 448, 453; *Wadd* v. *Hazleton,* 137 id. 215, 219; *Putnam* v. *Lincoln Safe Deposit Co.,* 191 id. 166, revg. 118 App. Div. 468, which modifies 49 Misc. 578; *Hammerstein* v. *Equitable Trust Co. of New York,* 156 App. Div. 644, 651; affd., 209 N. Y. 429; *Morse* v. *Morse,* 85 id. 53, 60; *Hoffman House* v. *Foote,* 172 id. 348, 355; *Noble* v. *Learned,* 153 Cal. 245, 251; *Adamson* v. *Black Rock Power & Irrigation Co.,* [C. C. A.] 297 Fed. 905; certiorari denied, 266 U. S. 630; appeal dismissed, Id. 592; *Korompilos* v. *Tompras,* [Mo. App.] 251 S. W. 80, 81; *Matter of Smith,* 144 Penn. St. 428, 436; *Matter of Eshbach,* 197 id. 153, 157), and the use of the words " trust " or " trustee " is not required.

(*Matter of Sohmer,* 153 App. Div. 752, 757; *Symmers* v. *Carroll,* 207 N. Y. 632, 637, affg. 149 App. Div. 641; *Morse* v. *Morse,* 85 N. Y. 53.) In the last-cited case the court says (at p. 60): " To constitute a va id expre s trust, it is not necessary that the purpose of the trust should be stated in the precise words of the statute It is undoubtedly necessary to a valid trust under the statute, that the trust shall be declared in the wi'l, or other instrument, by which it is created. But no particular formula of words need be used. It is not essential that the words ' trust ' or ' trustee ' should be used * * * It is sufficient if the intention to create a trust under the statute, can be fairly collected from the instrument, and what is implied from the language used, is, as in other instruments, deemed to be expressed."

The Supreme Court of Pennsylvania, in *Matter of Eshbach* (197 Penn. St. 153, 157), quoted with approval the requisites of a valid trust enumerated in Bispham's Equity (p. 109) as follows: " Three things, it has been said, must concur to raise a trust, sufficient words to create it, a defin te subject and a certain or ascertained object; and to these requisites may be added another, viz., that the terms of the trust should be sufficiently dec ared."

Viewed from a somewhat different angle, the elements necessary for a trust are (1) a settlor; (2) a trustee; (3) a beneficiary; (4) a trust *res;* and (5) a declaration of the terms of the disposition of the trust *res.* The facts of the instant transaction will now be examined in an effort to determine to what extent these essential elements are here present.

It is well settled that " a person in the legal possession of money or property, acknowledging a trust, becomes from that t me a trustee, if the acknowledgment is founded on a valuable or meritorious consideration. His antecedent relation to the subject, whatever it may have been, no longer controls, and, therefore, it is not the material fact to be ascertained." (*Day* v. *Ro h,* 18 N. Y. 448, 453.) This principle has been recognized on innumerable occasions. (*Wadd* v. *Hazleton,* 137 N. Y. 215, 219; *Beaver* v. *Beaver,* 117 id. 421, 428; *Young* v. *Young,* 80 id. 422, 438; *Robb* v. *Washington & Jefferson College,* 185 id. 485, 492; *Starbuck* v. *Farmers' Loan & Trust Co.,* 28 App. Div. 272, 276; *Schauberger* v. *Tafel,* 202 Ky. 9, 11; *Knagenhjelm* v. *Rhode Island Hospital Trust Co.,* 43 R. I. 559; *St. Catherine's Cemetery* v. *Fidelity Trust Co.,* 152 Ky. 797, 800; *Noble* v. *Learned,* 153 Cal. 245, 251; *State ex rel. Kansas City Theological Seminary* v. *Ellison,* [Mo. Sup.] 216 S. W. 967, 969; *Korompilos* v. *Tompras,* [Mo. App.] 251 S. W. 80, 81; *Matter of Eshbach,* 197 Penn. St. 153, 157.)

The declaration of trust necessary to constitute the relationship

has been repeatedly defined; *e. g.:* "Any declaration, however informal, ev ncing the intention with sufficient clearness will have that effect." (*Day* v. *Roth,* 18 N. Y. 448, 453.)

"It may be created by parol or n writing, and may be imp ied from the acts or words of the person creating it." (*Wadd* v. *Hazleton,* 137 N. Y. 215, 219.)

"To constitute a trust there must be either an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created." (*Beaver* v. *Beaver,* 117 N. Y. 421, 428.)

"'It is not necessary that this be done in express terms, but in the absence of statutory requirements any words or acts are sufficient which clearly denote the intention to relinquish his beneficial interest in the property *in præsenti,* and to hold it for the benefit of another.'" (*Noble* v. *Learned,* 153 Cal. 245, 251.)

To create a trust, "the acts or words relied upon must be unequivocal, implying that the person holds the property as trustee for another." (*Martin* v. *Funk,* 75 N. Y. 134, per CHURCH, Ch. J.)

Though it is not necessary that the declaration of trust be in terms explicit, the donor must have evinced by acts which admit of no other interpretation, that such legal right as he retains, is held by him as trustee for the donee. (*Heartley* v. *Nicholson,* 44 L. J. Ch. App. [N. S.] 277, per BACON, V. C.)

"The settlor must transfer the property to a trustee, or declare that he holds it himself in trust. (*Mulroy* [*Milroy*] v. *Lord,* 4 De Ge x, F. & J. 264, per Lord KNIGHT BRUCE.)" (See, also, *Maxwell* v. *Barringer,* 110 N. C. 76, 80; *Holt* v. *Wilson,* 75 Ala. 58, 64; *S hauberger* v. *Tafel,* 202 Ky 9, 11; *Matter of Interborough Consolidated Corporation,* [C♦ C. A. N. Y.] 288 Fed. 334, 349, affg. [D C.] 277 id. 249; certiorari denied, *Porges* v. *Sheffield,* 262 U. S. 752; *Robb* v. *Washington & Jefferson College,* 185 N. Y. 485, 492; *Starbuck* v. *Farmers' Loan & Trust Co.,* 28 App. Div. 272, 276; *Korompilos* v. *Tompras,* [Mo. App.] 251 S. W. 80, 81; *Knapp* v. *Publishers George Knapp & Co.,* 127 Mo. 53, 77; *Matter of Eshbach,* 197 Penn. St. 153, 157.)

It is the opinion of the court that the language used in the pertinent subparagraph of this agreement is amply within the letter and spirit of these decisions. Since, of course, the identity of the settlor trustee and of the beneficiary are certain, the only remaining element to be examined is the trust *res.* This is, of course, the interest of Leverich under the will of his grandfather, which was, a has been noted, a vested estate. As this was an alienable property right, there can be no question but that it was such property as might be made the subject of a trust, since a

trust can be created in any property, real or personal, which is, in the eye of a court of equity, property of value. (*Starbuck* v. *Farmers' Loan & Trust Co.*, 28 App. Div. 272; *Hoffman House* v. *Foote*, 172 N. Y. 348; *Currence* v. *Ward*, 43 W. Va. 367; *State ex rel. Kansas City Theological Seminary* v. *Ellison*, [Mo. Sup.] 216 S. W. 967; *Compo* v. *Jackson Iron Co.*, 49 Mich. 39; *Clark* v. *Frazier*, 74 Okla. 141, 145; Lewin on Trusts [13th ed.], 40 *et seq.*; 1 Perry on Trusts & Trustees [7th ed.], § 67.)

Finally, since this was a trust of personal property, there is no statutory inhibition to its erection for the purposes here contemplated, it having been held in *Hammerstein* v. *Equitable Trust Co. of New York* (156 App. Div. 644, 651; affd., 209 N. Y. 429).

" Trusts of personalty for third persons may be created for any lawful purpose as the statutes do not define their purposes as they do in express trusts of real estate. (*Gilman* v. *Reddington*, 24 N. Y. 9, 12; *Hirsh* v. *Auer*, 146 id. 13, 19.) A trust covering personal property only may embrace ' any purpose not unlawful, subject only to the law of perpetuity.' (*Matter of Wilkin*, 183 N. Y. 104.) "

It is the opinion of the court that the trust erected by the 6th subdivision of the 2d paragraph of this agreement is in all respects valid and binding upon the parties in its technical aspects, and that it should be given effect as coming within the spirit of the principle enunciated in many of the decisions hereinbefore considered, and which is expressed with peculiar aptness by the Supreme Court of Michigan (*Ellis* v. *Secor*, 31 Mich. 185, 188), as follows: " It is the duty of courts to enforce all lawful rights, so as to carry out the intention of the parties. That intention should always be observed if lawfully expressed; and it is only incumbent on legal tribunals to be very careful to ascertain the facts. There is much room for frauds and mistakes in cases of this kind, and therefore care should be used to sift the evidence. But where there is no doubt about the facts, it would be a legal wrong and gross injustice to refuse to act upon them fairly and without hesitation."

Some question has been raised by some of the parties as to whether the agreement as a whole does not constitute Leverich and Wohlers joint adventurers. Even were it to be held that it does, this would have no necessary bearing upon the questions involved, since it is primary that a valid trust may be contained in any sort of a document, including letters, memoranda or writings of a most informal nature. (*Hutchins* v. *Van Vechten*, 66 Hun, 69; affd., 140 N. Y. 115; *Fox* v. *Fox*, 250 Ill. 384; *Witherington* v. *Herring*, 140 N. C. 495.) An agreement of joint adventure

is merely a partnership in respect to a specific transaction or series of transactions, and, like other partnership arrangements, is governed by the terms of the agreement. (*Meinhard* v. *Salmon*, 249 N. Y. 458, 462, 463; *Worms* v. *Lake*, 198 App. Div. 776; *Hutchinson* v. *Birdsong*, 211 id. 316; *May* v. *Hettrick Bros. Co.*, 181 id. 3; *Medaris* v. *Rubinstein*, 199 N. Y. Supp. 1; *Freschsel* v. *Bellesheim*, 14 N. Y. St. Repr. 610.) In the present instance these terms clearly provide that Wohlers shall be indemnified out of the interest of A. Lyle Leverich under his grandfather's will for any losses which he may incur in connection with the transaction. In a sense, they were joint adventurers, since they were both interested in the success of a common enterprise, but as a result of the explicit terms of the document, they were interested in unequal degrees; if the enterprise proved successful, they were to share equally in the benefits, but the agreement is no less clear that all risk of monetary loss in the event of failure was on Leverich.

As a matter of fact, however, the agreement did not constitute a joint adventure in any true sense. By reason of the delivery by Leverich to Wohlers of one-half of his class A stock, pursuant to the terms of the agreement, they became equally interested in the profits of the enterprise, since it is quite apparent that the only value of the class B stock, within the contemplation of the parties, was in connection with voting control, but it is by reason of such stock ownership alone that their joint interest exists. They are no more copartners or joint adventurers than are the stockholders in any corporate enterprise, who also chance to be employees of the corporation.

The difficulty which the parties raising the question experience in this connection arises from the fact that they have failed to comprehend that the 1st sentence of the unnumbered paragraph beginning at the bottom of the 4th page of the contract is really merely a summary of the provisions contained in the preceding paragraphs, which define the rights and obligations of the contracting parties to the subject-matter and between themselves.

The receiver in supplementary proceedings seeks to avoid the assignment to the American Bond and Mortgage Company on the theory that it was a guaranty limited to an individual transaction, which he intimates was the clearing the property of liens prior to the placing of the corporate mortgage. No evidence has been adduced to support such a contention and nothing has been called to the attention of the court which would justify a determination that the guaranty was other than that which its wording indicates, namely, a continuing guaranty of all payments made at the request of Leverich. It was admitted at the hearing, however, that the

only outstanding obligation in this category is the advance, made on February 23, 1928, of the sum of $3,921.89 for insurance. It follows in equity, therefore, that the only claim wh ch the American Bond and Mortgage Company has against the fund is for this sum with interest from the date when it was paid.

As to whether or not this claim is a primary charge against the fund depends on the effect produced by the recording in this court of Wohlers' contract on December 28, 1928. Wohlers contends that such filing resulted in giving his claim a preference as a result of the provisions of section 32 of the Personal Property Law, which reads as follows:

" § 32. Transfers and mortgages of interests in decedents' estates to be in writing, and recorded. Every conveyance, assignment, or other transfer of, and every mortgage or other charge upon the interest, or any part thereof, of any person in the estate of a decedent which is situated within this state, shall be in writing, and shall be acknowledged or proved in the manner required to entitle conveyances of real property to be recorded. Any such instrument may also be recorded as hereinafter provided; and if not so recorded, it is void against any subsequent purchaser or mortgagee of the same interest or any part thereof, in good faith and for a valuable consideration, whose conveyance or mortgage is first duly recorded. * * * "

It was held in *Brown v. Volkening* (64 N. Y. 76, 82) that one who seeks to establish a right in hostility to a recorded title to or security upon land under and by virtue of a prior unrecorded conveyance or prior equities, must show actual notice to the subsequent purchaser of his rights, or prove circumstances such as would put a prudent man upon his guard and from which actual notice may be inferred and found. Whereas this decision concerned title to real estate, it is believed that the principle applies equally to any property rights in which a recording of title is permitted. (See *Tyler v. Strang*, 21 Barb. 198.) Indeed, the principle has been applied to the section under consideration. (*Leask v. Hoagland*, 64 Misc 156, 165; revd. on other grounds, 136 App. Div. 658.)

It would follow, therefore, that the burden in the instant case was upon the American Bond and Mortgage Company to demonstrate that Wohlers' interest was not acquired by him in good faith. The record is barren of any such showing. It, therefore, follows that Wohlers' rights must be given precedence over those of the American Bond and Mortgage Company. Since it has been stipulated that the amount which Wohlers advanced pursuant to his agreement, and which has not been repaid, amounts to

$252,102.74, exclusive of interest, which is not claimed, and the total principal distributable on Leverich's interest in his grandfather's estate amounts only to $247,964.92, it becomes unnecessary to pass upon the deferred rights of the receiver in supplementary proceedings and the trustee in bankruptcy, respectively.

Before closing the consideration of this phase of the subject, it may be well briefly to note the contention that as to the sum of $143,000 contained in the $152,639.78 judgment of the American Bond and Mortgage Company, paid by Wohlers, he should have demanded assignment of the coupons for the payment of which the note was given. The dealings with these coupons were regulated by section 4 of article II of the corporate mortgage, which reads as follows: " No bonds or coupons which may be paid, bought or redeemed by the company or by any guarantor or surety or by any one in the company's behalf, or by its successor or assigns shall be reissued, but the same shall be forthwith canceled and delivered to the corporate trustee and shall not thereafter be reissued or in any manner participate in the security of this mortgage or deed of trust, and no offer or tender of payment made conditional on the delivery of any bond or coupon uncanceled, shall be valid hereunder.  *  *  * "

The reason for and justice of such a provision is obvious as a protection to the corporate bondholders, who might otherwise be prejudiced in their rights against the mortgaged property. Neither Wohlers nor any one else making such payments had a right to the delivery of the coupons or to subrogation to the rights of their former holders, and equity will not penalize him for failure to make a futile gesture.

The final question in the case concerns the method of distribution of the accrued income on the trust for the life of Augustus A. Leverich, Jr. In view of the pending judgment creditor's action, this cannot presently be determined. Since, however, this is a subsidiary matter of minor importance, its disposition should not delay the main issue as to the distribution of the corpus of the trust fund. The latter should be paid over to Christopher Wohlers in its entirety, and application may later be made for proper notations at the foot of the decree respecting the accrued income.

Proceed accordingly.